25 C.C.P.A. (Patents)

### STEENSTRUP v. HEATH.

Patent Appeal No. 3940.

Court of Customs and Patent Appeals.
March 28, 1938.

F. Gerald Toye, of Washington, D. C., A. D. Salinger, of Boston, Mass., and Harry E. Dunham, of .Schenectady, N. Y. (H. L. Kirkpatrick, of Boston, Mass., and Edwin L. Rich, of counsel), for appellant.

George H. Strickland, of Dayton, Ohio, for appellee.

Before GARRETT, Presiding Judge, and BLAND, HATFIELD, LENROOT, and JACKSON, Associate Judges.

HATFIELD, Associate Judge.

This is an appeal in an interference proceeding from the decision of the Board of Appeals of the United States Patent Office affirming the decision of the Examiner of Interferences awarding priority of invention to appellee, the junior party.

The interference is between appellant's application No. 389,050, filed August 28, 1929, and appellee's application No. 510,-688, filed January 23, 1931.

The invention in issue relates to a method of manufacturing an expansion chamber (evaporator) for a mechanical refrigerating apparatus, as defined in the single count in issue.

The count originated in appellee's application. It reads: "The method of manufacturing an expansion chamber for a mechanical refrigerating machine, comprising, first corrugating one of two walls, then welding the two walls together between the corrugations and at or near their peripheries, and then bending the integral construction to form a plurality of walls of a sharp freezing chamber adapted to receive a receptacle."

Appellee being the junior party, the burden was upon him to establish priority of invention by a preponderance of the evidence.

It is conceded by counsel for appellant that appellee was the first to conceive the invention, and it is agreed by counsel for the parties that the sole issue in the case is whether appellee successfully reduced the invention to practice prior to May 1, 1928. If he did, he is entitled to an award of priority. If he did not, due to his lack of activity subsequent to May 1, 1928, and prior to the filing of his application (January 23, 1931), he is not entitled to such an award, and the decision of the Board of Appeals should be reversed.

■ It appears from the record that appellee was a "refrigeration engineer" of considerable experience, and had spent considerable time and effort in the so-called sheet metal evaporator art; that, on April 6, 1925, he filed an application for a patent disclosing a sheet metal evaporator; that, on August 27, 1929, that application matured into patent No. 1,726,486; that, on September 8, 1930, he filed an application for the reissue of that patent; that a reissue patent—No. 18,253—was issued, November 17, 1931; and that, although his applications disclosed a sheet metal evaporator, they did not disclose the invention here involved.

During the period from January 1, 1928, to May 1, 1928, appellee was engaged in the development of an evaporator at St. Louis, Mo., and was being financed by the witness J. H. Frier, Jr., who at that time was president of the Frier-Sturges Company.

Relative to his activities during that period, appellee testified that he developed and had constructed two evaporators in conformity with the method defined in the involved count; that the evaporators were made by the General Metals Products Company, in conformity with appellee's instructions; and that at least one of those evaporators was installed in a mechanical refrigerating apparatus.

The witness identified Exhibits Nos. 6 and 7.

Exhibit No. 6 is a photograph of two household refrigerators, and shows one of the evaporators, said to have been made in conformity with the involved invention by the General Metals Company for appellee, installed in one of the refrigerators. The evaporator is identified by the reference character "A."

Exhibit No. 7 was identified by appellee and the witness J. H. Frier, Jr., as one

of the evaporators made for appellee by the General Metals Products Company. It was said to be similar to the one shown in Exhibit No. 6.

Appellee stated that the refrigerator shown in Exhibit No. 6, of which his evaporator was a part, was successfully operated for a considerable period of time during the period from January 1, to May 1, 1928. Just when it was operated during that period, he did not state.

Mr. Frier, whose testimony was stipulated as a witness for appellee, appeared and, at the time, was employed in an executive capacity by the National Sugar Refining Company of New York City. Due to the importance of his testimony regarding the issues here presented, we deem it advisable to quote the following:

"Between January 1, 1928, and May 1, 1928, while financed by me, Mr. Heath developed and assembled several electrical refrigerators. Two of these refrigerators I can and do identify as appearing in the photograph marked Heath's Exhibit 6 and I further identify this photograph as having been taken in the building occupied by the Frier-Sturges Company on Washington Boulevard, St. Louis, Missouri.

"I personally saw the two refrigerators shown in Heath's Exhibit 6 *operating to produce refrigeration at many different times between January 1, 1928, and May 1, 1928.* I know that the evaporators or cooling units, used in the refrigerators shown in Heath's Exhibit 6 and one of which is indicated thereon by the reference character A, were U-shaped sheet metal evaporators. They were similar in appearance and construction to Heath's Exhibit 7 and were made by the General Metal Products Company of St. Louis, Missouri, under Mr. Heath's direction and on his order authorized by me. I did not see the actual making of these evaporators but *I do know that one of the reasons I financed Heath's development in St. Louis was Heath's explanation to me that he could make evaporators at a very low price by welding together two corrugated metal sheets around the edges and between the corrugations and then bending the welded structure into the form of a U.* It was my understanding at that time that the evaporators made by the General Metal Products Company for Mr. Heath were made in that manner.

"*The financing of Mr. Heath's development by me in St. Louis, Missouri, was*

*terminated on or about May 1, 1928, and I have not seen Mr. Heath since that date.*

"The two refrigerators shown in Heath's Exhibit 6 were the only two refrigerators made by or for the Frier-Sturges Company or for me having U-shaped evaporators *and that these refrigerators were not operated after May 1, 1928.* (Italics ours.)"

Appellee introduced certain evidence for the purpose of establishing that Exhibit No. 7 and the evaporator shown in the photograph—Exhibit No. 6—were made *in accordance with the involved* method.

The witness R. A. Kaltwasser, president of the General Metals Products Company, testified that during the period from January 1, to May 1, 1928, his company, in accordance with appellee's instructions, constructed several sheet metal evaporators. We quote a portion of his testimony:

"Q. 54. And would you kindly explain to us how they were made, please? A. Well, my recollection is that at first the tank consisted of two sheets of comparatively light gauge metal, the size, I see from these exhibits, was 17 inches by 29, was one of the sizes. They were placed flat together and acetylene welded all the way around the edges, making it entirely air-tight. One of the sheets at one end was a small-sized pipe nipple; at the other end, on the same side, was a small-sized pipe coupling for a pipe coupling. Then, there were quite a number of spot welds placed at fairly even intervals over the entire surface, connecting the two sheets together. After that they were formed into a 'U' shape.

"Q. 55. They were bent after the welding operation, were they? A. They were bent after the welding operation, yes. My recollection is that they didn't quite suit Mr. Heath, so some others were made—the same sized sheets, and they were spot welded or acetylened welded around the outer edges, but prior to that a number of grooves, or we term them 'beads,' were formed longitudinally in one sheet on one side, and transversely in another sheet at the extreme ends, and they had pipe fittings on one sheet, just the same as the preceding one, and they had pipe nipples on the outside; the same general shape as the original ones.

"Q. 56. That is, they were bent into a 'U' shape? A. Yes. I might add, they were spot welded in between the grooves.

"Q. 57. By 'grooves' you mean in between the beads? A. Beads.

"Q. 58. Now, may I ask, these beads that you spoke of, the longitudinal beads, were placed in one sheet before the sheets were bent, were they not? A. Yes, I said that prior."

Due to the views we hold, we deem it unnecessary to discuss the issue raised by counsel for appellant that appellee has failed to establish that Exhibit No. 7 and the evaporator shown in the photograph—Exhibit No. 6—were made in accordance with the involved invention.

Assuming for the purpose of this decision that appellee's evaporators were made by the method set forth in the testimony of the witness Kaltwasser, we are of opinion, nevertheless, that appropriate tests were necessary to determine whether the evaporator so made would operate successfully in a mechanical refrigerator. Appellee and the witness Frier were evidently of the same view prior to May 1, 1928, and it is not seriously contended here that the mere making of an evaporator in the manner described by the witness Kaltwasser was sufficient to reduce the invention to practice.

It appears from the record that during appellee's ex parte prosecution, claim 4 of his application was rejected as unpatentable over the patent to Linga, No. 1,110,-065, issued September 8, 1914. At the time of such rejection, the last clause of claim 4 apparently read: "and then bending the integral construction to *the shape desired.*" (Italics ours.) Thereafter, on May 2, 1933, appellee amended the claim by canceling the words "the shape desired," and substituting therefor the language "form a plurality of walls of a sharp freezing chamber adapted to receive a receptacle." As amended, the claim was allowed and corresponds to the count in issue. Subsequent to the amendment and prior to the allowance of the claim, appellee, in explaining his amendment and arguing for the patentability of the claim, stated that, as amended, the claim defined "a method of manufacturing an evaporator for a refrigerating machine wherein a freezing chamber is provided in the evaporator for the reception of a receptacle or ice tray adapted to contain a substance to be con-

gealed or frozen by the evaporator. The distinctions as pointed out by the Examiner in claim 4, prior to the present amendment thereto, over the Linga patent of record plus the recitation now incorporated in this claim is believed to fully differentiate this claim from anything shown or taught by the Linga patent. Claim 4 now defines a method of manufacturing an evaporator wherein a freezing chamber is provided in the evaporator for the reception of an ice tray and this method is not present in the Linga patent."

It is clear that, as understood by appellee in May, 1933, the method defined in the involved count was for the construction of an evaporator having a freezing chamber in which a substance was to be frozen by the evaporator.

We turn now to an analysis of the testimony relative to the operation of the refrigerating apparatus, shown in Exhibit No. 6, of which appellee's evaporator was a part.

Appellee testified that his evaporator was installed in a refrigerator, as shown in Exhibit No. 6, and stated, upon the suggestion of his counsel, that the refrigerator was successfully operated for a considerable period of time. His testimony pertinent to the subject is as follows:

"Q. 220. And this refrigerator that is disclosed in Exhibit 6 was successfully operated, was it not? A. It was.

"Q. 221. For a considerable period of time, Mr. Heath? A. Yes."

Mr. Frier, who financed appellee's development work, was directly interested in the tests to which appellee's evaporator was subjected. He must have known what they were, the conditions under which they were made, and the results obtained therefrom; nevertheless, he was content to say that he saw the two refrigerators shown in Exhibit No. 6 operating at many different times between January 1, and May 1, 1928, and that they were "operating to produce refrigeration." The degree of refrigeration produced was not stated. He did not state that the refrigeration produced was sufficient to congeal or freeze a substance contained in the evaporator receptacle or ice tray, nor did he say anything from which such fact might be properly deduced. In fact, there is nothing in the record to establish that at any time the refrigeration produced was even sufficient to preserve food.

The witness Frier knew the facts, and it is unlikely that they had escaped his memory at the time his testimony was stipulated, in view of the circumstances under which he obtained them. The witness stated that his association with appellee was terminated on May 1, 1928; that he had not even seen appellee since that time; and that the refrigerators referred to in his testimony were not operated after that date. No explanation was given by him for his apparent loss of interest in appellee's evaporators, nor is there anything in his testimony to indicate that he was of opinion that they were successfully operated.

There being no evidence of record corroborative of appellee's testimony that his evaporators were successfully operated, we must hold that the evidence is wholly insufficient to establish that appellee constructed and successfully operated evaporators in conformity with the method defined in the appealed count.

We need not concern ourselves here with the theories advanced by counsel for appellant as to why appellee's evaporators may not have been a success. It is sufficient to say that the record wholly fails to establish that they were.

For the reasons stated, we are constrained to disagree with the conclusion reached by the Board of Appeals.

Reversed.