Hatfield, Judge,
delivered the opinion of the court:
These are appeals in interference proceedings from the decisions of the Board of Appeals of the United States Patent Office affirming the decisions of the Examiner of Interferences awarding priority of invention to appellee, Julius J. Mojonnier in interference No. 65,224, and appellee Fritz G. Cornell, Jr. in interference No. 61,605.
Appellants introduced considerable evidence in interference No. 65,224, which, by stipulation by counsel for the parties, was made a part of the record in interference No. 61,605. Inasmuch as that evidence is relied upon by appellants in each of the involved interferences, we shall dispose of the issues in one opinion.
*1159 For the purpose of the bearing in this court, the records in the interferences were consolidated.

Appeal No. §950

The interference is between appellants’ application No. 577,829, filed November 28, 1931, and appellee Mojonnier’s application No. 506,164, filed January 2,1931.
Appellants are the junior parties and the burden was upon them to establish priority of invention by a preponderance of the evidence.
The invention relates to a heat exchanger for liquids, such as milk, as defined in counts 1 to 6, inclusive.
Of the involved counts, Nos. 2 and 3 are illustrative. They read :
2. A heat exchanger for liquids such as milk comprising a plurality of sections hinged at corresponding ends of the several sections' to swing laterally relatively to one another away from operative positions in which they stand close together side by side to positions in which the sections are accessible for cleaning, means for supplying a heat exchange medium to the several sections and operable to permit said swinging movement of said sections, means for delivering the liquid separately to said several sections when in their operative positions, the said sections being movable relatively to the liquid delivering means, and means for properly alining the sections in their operative positions relatively to said liquid delivery means.
3. A heat exchanger for liquids such as milk comprising a plurality of sections, means mounting said sections for movement laterally relatively to one another to and from operative positions in which they are arranged close together side by side, means for delivering liquid to said sections when in their operative positions, said sections being arranged in vertical groups each comprising a plurality of said sections disposed one above the other, the sections in each group being independently movable laterally, means for supplying a heat exchange medium to the corresponding sections of different vertical groups, and means for supplying a different heat exchange medium to other corresponding sections of different vertical groups.
Stipulated testimony was submitted on behalf of appellee.
The Examiner of Interferences held that that testimony was sufficient to establish conception of the invention by appellee as early as November 12, 1930, but was not sufficient to establish a reduction of the invention to’ practice, and that appellee was, therefore, restricted to January 2,1981, the filing date of his application, for constructive reduction to practice.
Due to the issues in the case and the views we hold with regard thereto, we deem it unnecessary to discuss the testimony submitted by appellee.
Appellants rely on an experimental apparatus, claimed to have been constructed in conformity with the appealed counts and successfully operated in November and December 1928, for conception and reduction to practice. Appellants submitted in evidence Exhibit *1160 No. 2, which consists of so-called “test sheets.” Sheets 3 to 1 of the exhibit, it is claimed, contain data indicating the successful operation of the apparatus. However, as was pointed out by the Board of Appeals, there is nothing in that exhibit to indicate the structure of the apparatus alleged to have been constructed and successfully tested by appellants in November and December 1928, except the following-notation appearing at the top of sheets 3 to 1, inclusive:
Surface Cooler Test iya"x4'xl6 Tube 4 Sects.,
which, obviously, is not sufficient to disclose a structure conforming to any of the counts in issue.
One of the purposes of the tests to which the experimental apparatus was subjected was, as appears from the testimony of appellants and their witnesses, to determine the “capacity and cooling efficiency” of a “hinged cabinet cooler” having a plurality of heat exchange sections, as compared with a cooler composed of a single section.
Appellants’ experimental apparatus is described in the testimony of one of the joint inventors, William Astle, who stated that it was constructed in the test laboratory of the Cherry-Burrell Corporation, assignee of appellants’ application, and that it—
* * * was made up of four of our standard surface cooler coils binged together by standard pipe fittings and unions in such a way that it could be opened up for cleaning- purposes, and etc. On the top of these units we had four distributor pipes one over each coil. These distributor pipes were perforated to permit the distribution and were fastened together or soldered together by a clamp which fit over the headers of the four coils. The hinges through which the circulation to the inside of the coils passed was made up of standard pipe fittings and ground joint unions, with the unions assembled in the vertical position. The circulation through these units or coils was fed by a manifold connection both on the inlet and discharge. The complete assembly was set upon a plate resting upon a couple of wooden horses with two standards connected to the feed pipes. The units were clamped together iu their manifold position by an ordinary wooden clamp, which was put there for the purpose while we were making temperature and capacity tests. The water came off the coils into a galvanized trough with a bottom outlet so as to catcb the multiflow over ail the coils for taking the capacities. This trough was made of galvanized iron and set into the boiler plate. The boiler plate was made wide enough for this purpose so the coils could be swung open and during the run for the observation of the flow over the inside of the coils.
Appellants and their witnesses agree that water was used instead of milk in making the tests, because, as stated by one of the joint inventors, Feldmeier, “that is our customary practice based on the fact that the heat transfer results are so close that it has not been found necessary to use milk, for test purpose, but only in cases where the matter of coating of heating or cooling surfaces due to precipitation of milk is involved.”
*1161 It appears that the apparatus described by the witness Astle was dismantled shortly after the tests were made, some of the parts being returned to the stock room and others, made specially for the test, were, as stated by the witness Astle, probably thrown “in the scrap pipe,” which, he stated, was the usual procedure.
No drawings of any kind were ever made disclosing that apparatus until shortly after the declaration of the involved interference (December T, 1932) when appellants’ Exhibit No. 3, a drawing made under the direction of the joint inventor Astle and in conformity with his recollection of the apparatus, was completed on December 16, 1932. That drawing was made at the request of counsel for appellants and can be considered only for the purpose of illustrating the apparatus, which, appellants and their witnesses testified, was constructed and tested in November and December 1928.
On July 18, 1929 one of the joint inventors, Feldmeier, wrote a letter (appellants’ Exhibit No. 4) to the patent attorneys of the Cherry-Burrell Corporation, “Parker & Prochnow,” relative to the filing of an application for a patent for a cabinet milk cooler, in which the following statement appears:
We have considered various ways of pulling the sections apart for cleaning. They might he hinged, or they might be pulled out endwise, as in the Price, but we believe the most practical way is as we have shown with the sections slidably hung from supporting bars near the top, so they can be pulled out sidewards. [Italics ours.]
There is no disclosure in that exhibit of a structure conforming to any of the counts involved in this interference. It appears therefrom, however, that Mr. Feldmeier then was of opinion that, although the heat exchange sections might be hinged, the most practical way of constructing them for cleaning purposes was to have them “slidably hung from supporting bars near the top, so they can be pulled put sidewards.”
It appears that a patent application was filed on October 14, 1929 by Mr. Feldmeier as the sole inventor. That application matured into patent No. 1,840,573 on January 12, 1932.
The record is somewhat confusing, as well as is the brief of counsel for appellants, due to the fact that it is claimed by their counsel that appellants are entitled to some consideration for the fact that they gave the apparatus disclosed in their patent to the public.
It was held by each of the tribunals of the Patent Office, and it is conceded by counsel for appellants that the multiple sections disclosed in the Feldmeier patent are “arranged to slide rectilinearly apart,” and not hinged to swing or move laterally relative to one another, as set forth in the involved counts.
It clearly appears that the invention defined in the appealed counts is not disclosed in appellants’ patent. Nor is there any evidence of *1162 record tending to establish appellants’ conception of the involved invention, unless the evidence relating to the construction and operation of the experimental apparatus in November and December 1928 can be so considered.
It appears from the record that the Jensen Creamery & Manufacturing Co. (the assignee of Fritz G. Cornell, Jr., the appellee in interference No. 61,605, who was originally a party in this interference but, due to the fact that he failed to appeal from an adverse decision by the Examiner of Interferences, is no longer a party thereto), exhibited a cabinet cooler having a plurality of hinged heat exchange sections at a dairy show in Atlantic City in October 1931; that that cabinet cooler was seen by the appellants and by Mr. Loomis Burrell, chairman of the Board of Directors of the Cherry-Burrell Corporation; and that as a result of seeing the Cornell cabinet cooler, appellants had their involved application prepared and filed in the Patent Office.
We deem it unnecessary to discuss all of the evidence in the case, or to state and discuss all of the arguments made by counsel for the parties.
It is clear from appellants’ Exhibit No. 3, and from the testimony of appellants and their witnesses, that the apparatus constructed and operated in November and December 1928 did not disclose a plurality of sections “arranged in vertical groups,” as set forth in counts 3 and 4, nor a “plurality of vertical groups of heat exchange sections,” as called for in counts 5 and 6. Accordingly, we must hold that appellants have failed to establish conception of the invention defined in counts 3 to 6, inclusive, prior to the filing of their application— November 28, 1931.
We turn, therefore, to a consideration of the question of whether the construction and testing of appellants’ experimental apparatus in November and December 1928 is sufficient to establish conception and reduction to practice of the invention defined in counts 1 and 2.
It should be borne in mind that one of the purposes of the tests performed by appellants was to determine “the capacity and cooling efficiency” of a “hinged cabinet cooler” having one group consisting of a plurality of heat exchange sections, as compared with a cabinet cooler composed of a single section.
It is true that appellants’ witnesses were all employees of appellants’ assignee and that they testified approximately five and one-half years after the happening of the events concerning which they testified, nevertheless, we are of opinion that, although they had the advantage of Exhibit No. 3 (which, as hereinbefore noted, was prepared shortly after this interference was declared), their testimony was sufficient to establish that an apparatus similar to that shown in Ex- *1163 hibi-t No. 3 was constructed and operated in November and December 1928, and that, as shown by tlie test sheets in Exhibit No. 2, satisfactory cooling could be produced.
The tribunals of the Patent Office concurred in holding, as we understand their decisions, that the construction and operation by appellants of their experimental apparatus in November and December 1928 were sufficient to establish conception of the invention defined in counts 1 and 2 as early as November 5 of that year. They concluded, however, that the heat exchange sections were not swung laterally relative to one another away from their operative positions during the testing operation of that apparatus so that they w-ere accessible for cleaning; that appellants had failed to establish a successful reduction of the invention to practice prior to their filing-date, November 28, 1931; that as there was no evidence that they had made any effort to reduce the invention to practice prior to October 1931, when they were spurred into activity by having seen the Cornell disclosure at the dairy show in Atlantic City, they were lacking in diligence from immediately prior to the filing of appellee’s application, January 2, 1931, and thereafter, until October of that year; and that, therefore, appellee was entitled to an award of priority.
The Examiner of Interferences stated in his decision that, if it should be held on appeal that appellants had reduced the invention to practice during November and December 1928, the doctrine of suppression and concealment of the ihvention, as applied in the case of Mason v. Hepburn, 13 App. D. C. 86, was applicable to the facts and circumstances in the instant case, and that, therefore, appellants were estopped as against appellee to assert claims to the involved invention.
In its decision, the Board of Appeals held that the doctrine of suppression and concealment, as applied in the Mason v. Hepburn case, supra, was not applicable to the instant case, and, in support of its holding, cited Stresau v. Ipsen, 22 C. C. P. A. (Patents) 1352, 77 F. (2d) 937.
If the testimony of appellants and their corroborating witnesses is entitled to any consideration, and we think it is, the experimental apparatus constructed by appellants in November and December 1928 had four “16 tube” heat exchange sections, hinged by standard pipe fittings and unions. The real question in the case, therefore, is whether the experimental apparatus was so constructed that the heat exchange sections could swing laterally relative to one another so as to make them accessible for cleaning.
Mr. Feldmeier, one of the joint inventors, testified that, although he did not examine the apparatus in detail, as he was interested only in results of the tests, the heat exchange sections could have been *1164 moved far enough, apart so as to permit inspection and cleaning, but not far enough apart for a man to get in between them.
Mr. Astle, one of the joint inventors, testified that the heat exchange sections or coils in the experimental apparatus “could be swung apart but not as far apart as what they would be for normal operation of cleaning,” but that they could have been swung far enough 'apart to make them accessible for cleaning. [Italics ours.] When asked whether the heat exchange sections or coils were actually swung laterally apart during the testing of the apparatus, the witness said: “I opened the sections apart to examine them before releasing the pipe fitters from the job. I merely opened these up far enough to see that they would open, so that we could properly see the distri- ■ bution over the coils.” [Italics ours.]
The witness Arthur E. Dygert, employed as a mechanic by appellants’ assignee, testified that during the testing of appellants’ apparatus he opened the outside heat exchange sections to see “hoio the water was distributing over the two inside sections.” [Italics ours.] He then testified on direct examination as follows:
Q. 291. Was there any other advantage in opening the sections up, in connection with the contemplated use of the apparatus?
A. Not that I hnow anything about.
Q. 30. Did you discuss the advantage of .cleaning in connection with the opening of the sections, with anyone?
A. It was talked about at the time, but I do not know who spoke about it-. [Italics ours.]
The witness Boland J. Wightman, sales engineer for appellants’ assignee, testified that he observed the testing of appellants’ experimental apparatus in November and December 1928; that the heat exchange sections were opened “to check distribution over them and to see if they could be properly cleaned”; that he saw the “outside sections moved away from the next ones and closed up again”; that the witness Arthur E. Dygert was making the tests at that time; and that the sections were normally in closed position. When asked “* * * did you ever see the inner units moved from their parallel relation?” he replied: “We opened them about an inch to look between the sections.” The witness further stated that to the best of his recollection the outer sections were moved about “a foot and a half to two feet at the outer end.” He then testified as follows:
R. XQ. 2. Approximately wbat was the maximum arc through which these iuner units could bs swung?
A. My answer would be a guess of a 90 degree included angle, each could be swung 45'degrees from its normal position. [Italics ours.]
Although appellants and their corroborating witness Wightman stated that the heat exchange sections in appellants’ experimental apparatus could have been swung laterally apart sufficiently to per *1165 mit them to be cleaned, there is no evidentiary basis for such a conclusion, and it is clear from the testimony that they were not'actually so moved.
Counsel for appellee contends that there is nothing in appellants’ descriptions of their experimental apparatus, nor in those of their corroborating witnesses, to indicate that that apparatus was so constructed that the heat exchange sections could heme teen swung laterally relative to one another so as to make them accessible for cleaning. In this connection it is argued that the heat exchange sections were supported by a plate resting upon two wooden horses, that it would have been necessary in separating them to slide them over the plate, and that there is nothing to show that, if the sections had been swung far enough apart to make them accessible for cleaning, the hinged or swivel joints connecting them were sufficiently strong to prevent them from sagging and causing leakage, at the joints. Many other arguments are presented by counsel lor appellee, which, due to the views we hold, need not be stated.
The Board of Appeals was of opinion that there was nothing in the record to establish that the heat exchange sections could have been swung far enough apart laterally to make them accessible for cleaning without causing sagging, distortion, and leakage in the “swiveled joint” connections. We quote from the decision of the board:
It is also apparent that in the structure shown in Exhibit S it would, be impossible to support the cooling elements from these swiveled joints for the weight of such elements would cause sagging and distortion of the connections. For the purpose of preventing this, the sections are supported on a table and it is presumed that in separating the sections they were slid over the surface of the table. We are of the opinion that this does not satisfy the limitations in counts 1 and 2 wherein it is stated that the sections are hinged so as to swing laterally. If the hinge structure is not strong enough to sustain the weight of the cooler section it cannot be said that it acts as a hinge. It is well known that the regulations of Health Departments are very strict in the matter of apparatus used in handling milk and it is essential that coolers of this type be so constructed that the various parts may be either disassembled or separated a sufficient distance apart to permit thorough cleaning and inspection. * * *
The testimony before us is not convincing that this cooler would admit of such opening as to permit the cooling and inspection operation to be carried out. Even admitting that the sections were moved apart sufficiently in order to determine whether or not the water being cooled was being evenly distributed over the inner surface of the cooler as well as the outside, this does not mean that the sections were opened wide enough for thorough cleaning and inspection. Nowhere is it contended that these sections were swung out free of the table probably for the reason that the hinge structure would not support the weight of the sections. [Italics ours.]
We think it is clear from the record that appellants have failed to establish that the heat exchange sections in their experimental *1166 apparatus were swung far enough apart laterally to make them accessible for cleaning, and that the most that has been established in this regard is that the sections were separated to such an extent only that the witnesses making the tests might determine whether there was a proper distribution of the flow of water over those sections.
Assuming, therefore, that the experimental apparatus constructed and tested by appellants and their witnesses in November and December 1928 is sufficient to establish conception of the invention, it is clear that appellants have failed to establish that they successfully reduced it to practice during that period, or at any time prior to the filing of their involved application — November 28, 1931. In so holding, we deem it unnecessary to enter upon a discussion of the reasons why appellants’ experimental apparatus might or might not have operated successfully; it is sufficient to say that appellants failed to establish by a prepondenrance of the evidence that it did. Accordingly, we are in agreement with the conclusion reached by the tribunals of the Patent Office.
The decision of the Board of Appeals is affirmed.

Appeal No. 3951

The interference is between appellants’ application No. 517,829, filed November 28, 1931, and appellee Cornell’s application No. 540,-696, filed May 28, 1931.
Appellants are the junior parties and the burden was upon them to establish priority of invention by a preponderance of the evidence.
The invention relates to a heat exchanger for liquids, such as milk, as defined in the single count in issue, which reads:
A heat exchanger for liquids such as milk comprising a plurality of sections hinged at corresponding ends of the several sections to swing laterally relative to one another away from operative positions in which they stand close together side by side to positions in which the sections are accessible for cleaning, a common supply header for the several sections, hollow hinge connections which provide passages between said header and the several sections, and means for delivering liquid separately to said several sections when in their operative positions.
The invéntion defined in the count in this interference differs from the invention defined in the counts in interference No. 65,224, appeal No. 3950, in that the involved count calls for “a common supply header for the several sections, hollow hinge connections which provide passages between said header and the several sections”; whereas count 2, for example, of interference No. 65,224 calls for “means for supplying a heat exchange medium to the several sections and oper *1167 able to permit said swinging movement oí said sections.” The involved count also differs from counts 3 to 6, inclusive, in that interference in that it does not call for the cooling sections being arranged in vertical groups.
Evidence was submitted by each of the parties.
The Examiner of Interferences held that the stipulated testimony of appellee was not sufficient to establish either conception of the invention or reduction of it to practice prior to his filing date, May 28, 1931, and that, therefore, he was restricted to that date for both conception and constructive reduction to practice.
ddie tribunals of the Patent Office concurred in holding that the specific structure defined by the appealed count was disclosed in appellants’ experimental apparatus constructed and tested during November and December 1928; that appellants were entitled to a date as early as November 5, 1928 for conception of the invention; that they had failed, however, to establish a successful reduction of the invention to practice during the testing of their experimental apparatus in November and December 1928; that they had failed to establish diligence in reducing the invention to practice immediately prior to the filing of appellee’s application, May 28, 1931, and thereafter, until sometime in October 1931; and that, therefore, appellee was entitled to an award of priority.
It will be observed that the involved count calls for a plurality of cooling sections, hinged at corresponding ends of the several sections to swing laterally relative to one another to positions in which they are accessible to be cleaned.
The issue in the case is the same as that involved in interference No. 65,224; that is, whether appellants have established that the experimental apparatus was so constructed that the heat exchange sections could swing laterally relative to one another away from their operative positions so as to make them accessible for cleaning.
In our decision in interference No. 65,224 we fully considered the evidence introduced by appellants and held that appellants had failed to establish a successful reduction to practice during November and December 1928; that they were not diligent in their efforts to reduce the invention to practice from December 1928 until October 1931, when they were spurred into activity by seeing appellee’s cabinet cooler, which had a plurality of hinged cooling sections, at a dairy show in Atlantic City in October of that year. It is unnecessary, therefore, for us to again review the evidence in the case.
For the reasons stated in our-decision in interference No. 65.224, appeal No. 3950, the decision of the Board of Appeals is affirmed.