**TOLEDO SCALE CORPORATION,**
Plaintiff-Appellee,

v.

**WESTINGHOUSE ELECTRIC CORPORATION, Defendant-Appellant.**

**WESTINGHOUSE ELECTRIC CORPORATION, Plaintiff-Appellant.**

v.

**TOLEDO SCALE CORPORATION,**
Defendant-Appellee.

No. 16010.

United States Court of Appeals
Sixth Circuit.

Oct. 9, 1965.

174

C. L. Freedman, Pittsburgh, Pa., Carl F. Schaffer, Owen & Owen, Toledo, Ohio, on brief, Ralph H. Swingle, Pittsburgh, Pa., of counsel, for appellant.

David H. Wilson, Jr., Toledo, Ohio, Marshall, Wilson & Yeasting, Toledo, Ohio, on brief, for appellee.

Before CECIL,* PHILLIPS and EDWARDS, Circuit Judges.

EDWARDS, Circuit Judge.

This appeal concerns an invention (stated in 23 counts) designed to speed up the operation of automatic elevators. It is undisputed that inventor Phillip C. Keiper, who assigned his patents to appellant Westinghouse, first conceived of this invention. It is also undisputed that Westinghouse first applied for patents thereon.

Shortly after Keiper conceived of the particular invention involved here, Walter A. Nikazy, an engineer employed by the Haughton Elevator Company, independently conceived of essentially the same scheme. Nikazy's claims have been assigned to Haughton, which has now been acquired by (and operated as a division of) plaintiff-appellee, Toledo Scale.

Where Westinghouse claims rest upon priority of conception and patent application, Toledo's claims are based wholly upon the contention that it and its assignees were the first to reduce the invention to practice. Toledo claims that it accomplished this reduction to practice by installation and operation of all counts of the invention in a period between December 10, 1953, and January 30, 1954. Westinghouse's patent application was dated January 28, 1954.

Although there are numerous questions argued to us on this appeal, they can be summarized as one dispute of substance; namely, did Toledo accomplish reduction to practice of all counts of this invention prior to January 28, 1954?

This question of fact has been presented to, and decided by, two fact-finding agencies. On May 31, 1961, the Board of Patent Interferences, in an interference action brought by Toledo, found for Toledo's claims as to all of the counts of the invention in dispute before us. On motion for reconsideration by Westinghouse, the Board of Patent Interferences thereafter reaffirmed its finding in favor of Toledo, except as to Counts 8, 9 and 22, which it then awarded to Westinghouse. Westinghouse then filed a notice of appeal (from those decisions

* Judge Lester L. Cecil became a Senior Circuit Judge on August 1, 1965.

favorable to Toledo) to the United States Court of Customs and Patent Appeals. At this point Toledo filed the instant civil action before the United States District Court for the Northern District of Ohio, Western Division, in accordance with Title 35 U.S.C. §§ 141 and 146.

Toledo's suit sought to invalidate the award of Counts 8, 9 and 22 to Westinghouse. Westinghouse in turn then filed a similar action to contest the Board of Patent Interferences' award of the other 20 counts to Toledo. Thereupon the two actions were consolidated for trial.

Testimony concerning the conflicting claims was heard at length before Judge Kloeb, who found for Toledo on all issues in dispute. Judge Kloeb entered findings of fact and conclusions of law as the basis for the judgment from which Westinghouse brings this appeal.

The invention which is the subject of this controversy involves the use of an electric beam across the door of an elevator for the purpose of sensing the entrance (or exit) of passengers at each floor. The passenger interrupts the beam by moving through the door, and when when he clears it, the restoration of the beam activates a timing circuit, which (after a short delay) initiates the closing of the door. By this means it is possible to save waiting time for automatically operated elevators in those instances where the prospective passenger (or passengers) are located so as to be able to enter the elevator quickly.

The invention has usefulness only when there is no operator in charge of the car. Since the calling button on each floor would be located adjacent to a single or a double operation, the invention's maximum usefulness would pertain to its operation on a bank of several or more automatic elevators.[1]

The proofs produced by Toledo before Judge Kloeb indicate that in the fall of 1953 Toledo began work on the design and construction of banks of automatic elevators for three major buildings—the 4215 Crescent Street Building, Long Island City, New York; Commodore Perry Hotel, Toledo, Ohio; and the Secor Hotel, Toledo, Ohio. The plans for these elevators, as demonstrated by engineering drawings, contemplated use of Nikazy's invention in all disputed counts. But it is undisputed that none of these installations were completed or operated prior to January 28, 1954, the date of the Westinghouse patent application.

Toledo's claim of reduction to practice rests, therefore, on certain work which employees of its Haughton Division per-

---

1. Nikazy's patent describes the basic purpose of the invention as follows:

"This invention relates to elevator controls and in particular to control means for completely automatic elevators arranged to vary the standing time at a floor in accordance with the passenger demand.

"When push-button controlled automatic elevators are operated without the services of an attendant the controls must be adjusted so that the elevator stands at a floor for a certain length of time before closing the doors and proceeding to the next floor. If an operator is in attendance the minimum time can be made materially shorter since the operator can manually lengthen the time interval by interrupting the door closing operation as may be required to permit the entrance or exit of passengers. For satisfactory operation without an attendant the doors must be held open for a time interval generally equal to the maximum time required for prospective passengers to move to the elevator entrance and enter the car. If a number of cars are arranged in a bank so that the end cars are quite widely separated this time interval required for a prospective passenger to reach the car answering his call may be quite long. Situations may also occur where the intending passenger may be standing directly in front of the car that answers his call in which case he may promptly enter the car and then have to wait for the remainder of the time interval before the car will start. This waiting time is quite annoying and therefore objectionable.

"The principal object of this invention is to provide a control that is responsive to the entrance or exit of a passenger and effective to shorten the standing time at a floor to a minimum time interval after the last passenger has entered or left the car."

formed on a bank of six elevators in the NBC Building in Cleveland, Ohio, between December 10, 1953, and January 30, 1954. Toledo claims that it installed its invention on three of these elevators and operated said elevators singly and together.

The NBC Building had been constructed with six passenger elevators designed for employee operation. In July of 1953 it employed Toledo's Haughton Division to begin to convert its elevators to semiautomatic. Two such conversions were effected and proved successful. NBC then employed Toledo to convert all of the elevators to full automatic operation.

On or about December 10, 1953, three of Toledo's employees installed a control panel for Elevator No. 3, which control panel had all of the essential control features of the disputed invention. The necessary modifications were thereupon made on Elevator No. 3 and it was tested in operation with the disputed invention (which Toledo had then named Standing Time Saver) working.

The facts just recited were established by testimony before Judge Kloeb without dispute. It is also undisputed, however, that before Elevator No. 3 was turned over to NBC for regular operation, a subsequent adjustment of the waiting time interval was made. The shortening of the basic waiting time interval had the effect of rendering the Standing Time Saver device ineffective in subsequent operation, although it was left installed and operating. Westinghouse depends upon these latter facts to argue that the installation on Elevator No. 3 was not in legal terms a "reduction to practice," of the invention as to Counts 1, 3–5, 11–21 and 23.[2] It claims that at most this operation represented an unsuccessful—or an abandoned experiment.

On this basic disputed point Judge Kloeb found as follows:

"We have studied the transcript of the evidence submitted in the case, the exhibits, the stipulations and the briefs of the parties involved, and conclude that Toledo did build a complete operative structure embodying everything called for in the claims in issue, and tested it under conditions of actual use to establish with certainty that it worked for its intended purpose, and that it established such testing and use in elevators 3, 1 and 2 in the NBC Building prior to January 28, 1954, and that, therefore, Toledo has maintained its burden of proof and has established an actual reduction to practice prior to the critical date of January 28, 1954, and should, therefore, be awarded the priority of invention of the counts involved. We do not agree with the contention of Westinghouse that the experiment was abandoned by Toledo. * * *"

On appeal from a District Court's finding of fact in a patent case, we are required to accept the findings of fact entered by the District Judge if they are supported by substantial evidence and unless they are "clearly erroneous." Rule 52(a) Fed.R.Civ.P.; Graver Tank & Manufacturing Co., Inc. v. Linde Air Products Co., 336 U.S. 271, 69 S.Ct. 535, 93 L.Ed. 672 (1949), rehearing granted, 337 U.S. 910, 69 S.Ct. 1046, 93 L.Ed. 1722 (1949), aff'd., 339 U.S. 605, 70 S.Ct. 854, 94 L.Ed. 1097 (1950); Maytag Company v. Murray Corporation of America, 318 F.2d 79 (C.A.6, 1963).

In our judgment the evidence upon which the District Judge relied as to these counts was not only substantial, it was thoroughly convincing. At the outset the District Judge had before him the fact that the Board of Patent Interferences had awarded priority of invention to Toledo's inventor as to all of these counts. This court has given great weight to such Patent Office findings. Heston v. Kuhlke, 179 F.2d 222 (C.A.6, 1950).

At the trial Toledo introduced the shop drawings from which the Standing Time Saver features installed on the NBC Building elevators were fabricated.

---

2. At trial Westinghouse abandoned its claims as to Counts 2, 6, 7, and 10.

These drawings (Toledo's Exhibits 4a thru 4h) are dated 11–1–53.

Toledo's Superintendent of Field Operations, Mr. C. K. Wilson, testified concerning the tests made on the three cars first converted to full automatic operation in the NBC Building:

"Q   Can you describe the door controlling cycle for a typical stock elevator car No. 3 as you tested it in the NBC Building prior to or on or about December 10, 1953?

"A   Yes.  At that time when they were riding the—or when we were riding the elevator and when we would pick up a signal to slow down, when the car reached approximately six inches of the floor the door mechanism relays would be energized and the door would start to open.

If the light beam was not interrupted the door would remain open something like seven seconds and it would .start to reclose.

"Q   Did you test the elevator in the fashion you just described?

"A   Yes.

"Q   Do you know what would happen if the light beam had been broken?

"A   That interval would be reduced down.

"Q   Did you test the elevator with the light beam broken?

"A   Yes.

"Q How did it function?

"A   When the light beam was broken the door would open.   It would remain open for something like two seconds and then start to reclose.

"Q   Will you tell us how you broke the light beam?

"A   By walking through the beam.

"Q   While you were testing these operations was the elevator responsive to all controls in the system?

"A   Yes.

"Q   Did the elevator have any effect on the remainder of the system?

"A   You mean the other elevators?

"Q   The other elevators, if it did.

"A   No.

MR. SCHAFFER: What was the answer?

THE REPORTER: The answer is 'No.'

"By Mr. Wilson:

"Q   Mr. Wilson, were elevators 1 and 2 operating at the time of your test?

"A   Yes.

"Q   Did you observe their operations, elevators 1 and 2, at that time?

"A   Sure.

"Q   How were they being controlled at that time?

"A   They were still on the modified operatorless operation, unattended.

"Q   Can you describe how the elevators one and two would respond to a landing call during the tests of elevator 3?

"A   If there was a landing call registered, elevators 1 and 2 would stop and pick up the call.

"Q   During the period of the tests did you observe them picking up calls?

"A   Yes.

"Q   Did car No. 3 respond to landing calls?

"A   It did when we put it in service.

"Q   But it did not during the tests?

"A   I am sure during the testing that we blocked the non-stop relay so that the car would not pick up a landing call at that time.

"Q When you put it in service—or I should say, when did you put it in service?

"A On or about December 10, 1953.

"Q At the time you put it in service did you observe its operation?

"A Yes.

"Q Did you observe its door control?

"A Yes.

"Q The operation of the door control?

"A Yes.

"Q Would you describe the operation of the door control?

"A When it went in service it would stop at a floor.

"Q Why would it stop at a floor?

"A In response to a call registered in the car or on the landing of a passenger.

"Q All right. Continue.

"A The door would open and the passenger would walk through the beam and the door would remain open something like two seconds, and the door would start to close again.

If the second passenger walked through the beam the door would reopen and remain open another two seconds.

"Q What was the condition of elevators 1 and 2 at this time, at the time you were observing car No. 3 in service?

"A We took No. 1 elevator out of service next to start the modernization to operatorless control.

"Q What was the condition of car No. 2?

"A It was still running on the modified form.

"Q What do you mean by 'the modified form'?

"A Well, the modified operation that we put it on during the middle of the summer, unattended.

"Q What did you do with elevator car—which elevator did you modify?

"A No. 1 was the next one to follow.

"Q What did you do in modifying elevator No. 1?

"A We installed the additional panel that Toledo sent on top of the present controller.

"Q What is the significance of the additional panel?

"A It provided all the operating relays for operatorless control, including the photocell relays. We also installed the photocell equipment on the car and at the lobby floor.

"Q When did you say you began this modification of car No. 1?

"A Almost immediately after car No. 3 was placed in service.

"Q And how long did it take you to complete the modification of car No. 1?

"A Approximately three weeks.

"Q When you had completed the modification of car No. 1 what did you then do with it?

"A We tested the circuits and put it in operation.

"Q How did you test the circuits?

"A The same way we did—tested the circuits on No. 3.

"Q Did you personally test those circuits?

"A I can't remember whether I tested the circuits on No. 1 or not. I do remember that I tested the circuits on No. 3.

"Q After car No. 1 was put in service what was your next step in this modernization of the elevators in the NBC Building, Mr. Wilson?

"A We took elevator No. 2 and changed it over to operatorless, adding the same equipment, the additional panel, a photocell on the car and the photocell at the lobby floor.

"Q When did you complete the modernization to fully automatic to Car No. 2?

"A In approximately three weeks.

"Q Three weeks from when?

"A That would take us up to January—the latter part of January.

"Q When you had completed—January of what year, I should ask?

"A 1954.

"Q And when you had completed the modification of car No. 2 what did you do with it?

"A We tested the circuits and turned it over to the building."

Similar testimony was given by two other of Toledo's employees who had worked on these conversions.

■ We recognize, of course, (as no doubt did the District Judge) that oral testimony of the employees of a party to litigation pertaining to long past events is to be regarded with caution. Cold Metal Products Company v. E. W. Bliss Co., 285 F.2d 244 (C.A.6, 1960); Deering v. Winona Harvester Works, 155 U.S. 286, 15 S.Ct. 118, 39 L.Ed. 153 (1894).

But here the essential dates are established by the documentary evidence of the shop drawing and by the undisputed and independent testimony of the president of the corporation which owned and operated the NBC Building, plus dated letters and reports produced by him.

The NBC Building executive, Mr. George Opdyke, testified to witnessing the testing of the Standard Time Saver on an elevator which he believed to be car No. 3 in December of 1953. He also testified to sending a letter, dated February 1, 1954, to all the building tenants on the upper stories saying in part:

"Beginning Tuesday morning, February 2nd, 1954, the first three elevators nearest Superior Avenue will serve floors 14 to 21. This is one of the last steps in the final con-version of all elevators to automatic operation."

He also testified to sending a printed annual report (Toledo's Exhibit 12) to the stockholders of the Cleveland Securities Corporation, dated February 22, 1954, saying in part (and with reference to the NBC Building):

"The three new elevators serving the top half of the building are now converted to full automatic, oper-atorless operation."

The second major factual question in this appeal pertains to Counts 8, 9 and 22 of the invention. Counts 8 and 9 describe the operation of the Standing Time Saver on a multiple bank of elevators. It is Toledo's position that the Standing Time Saver was installed on elevators No. 3, 1 and 2, in that order, in the NBC Building and operated together prior to January 28, 1954. On this question also Judge Kloeb found the facts in favor of Toledo. The general finding that "Toledo did build a complete operative structure embodying everything called for in the claims in issue, and tested it under conditions of actual use * * * in the NBC Building prior to January 28, 1954 * * *" was augmented by specific reference to Counts 8, 9 and 22:

"It is our view that a reduction to practice by Toledo has been established as to counts 8, 9, and 22, and that, therefore, the decision of the Board of Patent Interferences of August 1, 1961 as to counts 8, 9 and 22 should be, and is reversed, and Nikazy is held to be the first to complete the invention, counts 1 through 23, as originally determined by the Board of Patent Interferences on May 31, 1961."

■ As to these three counts, of course, the weight of the Patent Office findings favored Westinghouse. Thus the District Judge was required to find testimony which carried "thorough conviction" in order to reverse the Board of Patent Interferences.

"While an action under § 4915 is an independent proceeding, the Supreme Court made it clear in Morgan v. Daniels, 153 U.S. 120, 14 S.Ct. 772, 773, 38 L.Ed. 657, that it is something more than a mere appeal,—'It is an application to the court to set aside the action of one of the executive departments of the government. * * * It is something in the nature of a suit to set aside a judgment, and, as such, is not to be sustained by a mere preponderance of evidence. Butler v. Shaw, C.C., 21 F. 321, 327. It is a controversy between two individuals over a question of fact which has once been settled by a special tribunal, entrusted with full power in the premises.' And again, 'where the question decided in the patent office is one between contesting parties as to priority of invention, the decision there made must be accepted as controlling upon that question of fact in any subsequent suit between the same parties, unless the contrary is established by testimony which in character and amount carries thorough conviction.'" Heston v. Kuhlke, supra, 179 F.2d at 226.

Actually, count 22 referred not necessarily to multiple operation, but to the detection by the photoelectric cell of a passenger movement subsequent to the first one so as to provide an additional delay time before initiating the closing of the elevator doors. Before the District Judge, Wilson and other Toledo employees testified specifically to making such tests. We regard their testimony as confirmed by the evidence already recited and by this specific comment from the NBC Building executive, Opdyke:

"Q Can you describe generally the operation of the Standing-time Saver?

"A Well, when the electric eye-beam is broken, the time of closing is altered from the preset time, which can be anything, I guess, from —to another time which is shorter than that.

"Q What was the purpose of doing this?

"A The idea is to speed up service and also when a stream, as I understand it, when a stream of riders are entering the car that the door closes very soon after the last one has passed into the car."

■ As to Count 22, there may have been deficiencies of proof before the Board of Patent Interferences, but the record before the District Judge was clearly sufficient to carry "thorough conviction" as to tests pertaining to this count.

Although the evidence to support the multiple operation tests as to Counts 8 and 9 is not as conclusive as the evidence supporting reduction to practice of the other counts, we nonetheless believe that it is sufficient to support the District Judge's finding that Toledo had met its burden of proof.

All witnesses, of course, confirm that while conversion of one elevator to full automatic and Standing Time Saver operation was in progress, all other elevators were in use. They further agree that three of these (including the one being worked on) had been previously converted so that employee operators could be eliminated and the elevators could be operated by passengers pressing the hall buttons (except for the ground floor) and the buttons in the elevator itself.

The narrow question presented is whether in fact at least one of the elevators converted to fully automatic was tested with the Standing Time Saver in effective operation while it was responding to passenger summonses and while two other elevators were likewise being operated without employee operators and subject to the same calls.

Resolution of this issue depends in large measure upon whether or not Toledo's three employees who worked on this installation told the truth. Their testimony in the District Court on this

point is certainly definite. Oulton, a Toledo employee, said:

"Q   During the joint operation of cars 3 and 2 how was No. 3 being operated?

"A   Fully automatically.

"Q   Did it have this adjustment of the—I'd better lay the basis for that.

"Did the stopping interval for car No. 3 change in response to load transfers when it was running automatically after it had been turned over to the building?

"A   It definitely did.

"Q   Did you observe it operate in that fashion?

"A   Yes, I did.

"Q   How was car No. 3 stopped?

"A   Car No. 3 would stop for a car call or a landing call.

"Q   And how was car No. 2 stopped?

"A   The same way."

Two other Toledo employee witnesses testified to the same effect. As we read the record, they were neither impeached nor shaken by cross-examination. The trial judge saw and heard them. He found that the multiple operation tests were indeed made. Westinghouse was able to offer no controverting evidence, and since the Standing Time Saver device would have little utility except in multiple operation, it seems logical that such a test would have been undertaken.

Further, the shop drawings dated 11-1-53 offer some confirmation as to the installation of the circuitry and devices necessary for multiple operation tests of the invention.

Finally, we find independent support of some essential facts pertaining to the question in dispute in Toledo's Exhibit 9—a document which NBC's building manager Opdyke identified as prepared "at the time the cars went into service." This exhibit shows cars 1 and 2 put into effect as "operatorless" elevators on 7/9/53 to serve the 17th to 21st floors, and Opdyke testified to its accuracy.

The evidence we have recited seems to us (as it obviously did to the District Judge) to establish as a matter of "thorough conviction" that Toledo did accomplish the installation of its invention and the testing of its invention as to all counts.

Appellant claims, however, as a matter of law that even if the tests claimed to have been made were made, they were not sufficient to accomplish reduction to practice and that Toledo subsequently abandoned the invention.

■   The abandonment contention seems to us to merit little discussion. From a period prior to the NBC Building operations to plaintiff's commencement of an interference action before the Board of Patent Interferences examiners, Toledo was continuously at work on three major elevator installations. The Standing Time Saver device was designed and built into each of these installations. Further, the Standing Time Saver installation on the NBC elevator was never removed and subsequently was put into effective operation again. Further, on its first notice (a Wall Street Journal story of March 29, 1954) that Westinghouse was testing a similar system, Toledo moved promptly to commence an interference action.

Furthermore, these tests were field tests on regular commercially operated elevators. They were repeated on three elevators and they included tests with regular passenger operation which demonstrated that the invention was working satisfactorily.

We have already noted the fact that thereafter each of the elevators was adjusted to shorten its basic waiting time to a point where the useful operation of the invention was terminated. This was done before the cars were turned

back to the building for its regular commercial use. It was done because the NBC Building supervision asked for a speeding up of the five elevators in service while one was being worked on.

And actually, the useful commercial application of the Standard Time Saver at the NBC Building was not effected thereafter for several years.

■ Satisfactory reduction to practice of an invention does not, however, demand proof of successful commercial use. Corona Cord Tire Co. v. Dovan Chemical Corp., 276 U.S. 358, 48 S.Ct. 380, 72 L.Ed. 610 (1928); Minnesota Mining & Mfg. Co. v. Van Cleef, 139 F.2d 550 (C.A.7, 1943). It does demand tests which successfully prove practical utility for its intended use. The Court of Customs and Patent Appeals has outlined these principles thus:

"To constitute an actual reduction to practice of a machine, the device must be completed in an operative form capable of successfully demonstrating its practical utility in its intended field of use. Ocumpaugh v. Norton, 25 App.D.C. 90; Van Auken v. Cummings, 49 F.2d 490, 18 C.C.P.A., Patents, 1250. Unless the device is of such a nature that by its very simplicity its practical operativeness is manifest, Mason v. Hepburn, 13 App.D.C. 86, 89, the machine must be tested under actual working conditions, Smith v. Nevin, 73 F.2d 940, 22 C.C.P.A., Patents, 748, in such a way as to demonstrate its practical utility for its intended purpose, Sydeman v. Thoma, 32 App. D.C. 362, 373; Feldmeier et al. v. Mojonnier, 97 F.2d 124, 25 C.C.P.A., Patents, 1158, beyond probability of failure, Taylor v. Swingle, 136 F.2d 914, 30 C.C.P.A., Patents, 1219. Actual performance is required of the function for which the machine is intended with a quality, extent, and character of operation sufficient to indicate its utility in the environment in which it is contemplated to be useful. Lavin v. Pierotti, supra, [129 F.2d 883, 29 C.C.P.A., Patents, 1235]; Steenstrup v. Heath, 95 F.2d 514, 517, 25 C.C.P.A., Patents, 981, 986; Van Auken v. Cummings, supra." Field v. Knowles, 183 F.2d 593, 601, 37 C.C.P.A. (Patents) 1211 (1950).

See also: Corona Cord Tire Co. v. Dovan Chemical Corp., supra; Elmore v. Schmitt, 278 F.2d 510, 47 C.C.P.A. (Patents) 958 (1960).

The District Judge clearly had this standard in mind when he entered his findings of fact and legal conclusions. He found that Toledo had met the burden of proof imposed on it as to both groups of disputed counts. As to both groups he held that Toledo has accomplished reduction to practice of the invention.

■ We do not think that we can properly reverse this holding as a matter of law. It does not seem to us that the tests we have described were either incomplete, inconclusive, or unsatisfactory. They were made by persons skilled in the art. Subsequent to the tests Toledo proceeded without delay to install its invention in three instances of successful commercial operation. The Standing Time Savers installed on the first three fully automatic elevators in the NBC Building were never dismantled and subsequently were themselves put into effective commercial use. We believe the tests were such as to demonstrate the practical utility of the Standing Time Saver "beyond probability of failure." Field v. Knowles, supra, 183 F.2d at 601.

Affirmed.