**JIRA v. WEBER et al.**

No. 5891.

United States Court of Customs
and Patent Appeals
Feb. 6, 1953.

Woodling & Krost, Cleveland, Ohio (George V. Woodling, Ray S. Pyle and

Bruce B. Krost, Cleveland, Ohio, of counsel), for appellant.

Ralph B. Stewart, Washington, D. C., for appellees.

Before GARRETT, C. J., and O'CON-NELL, JOHNSON, WORLEY, and COLE, JJ.

GARRETT, Chief Judge.

This is an appeal from the decision of the Board of Interference Examiners of the United States Patent Office awarding priority to joint inventors Weber and Griemsmann (hereinafter often referred to in the singular as the senior party), in an interference proceeding respecting, as stated in the board's description, "a film of an alloy of noble metals on a non-conductive carrier, and to a process of preparing the article by the use of a metallic organosol."

The following counts are involved:

"1. An article of manufacture comprising a non-conductive carrier, an alloy film of at least two substantially stable and non-oxidizable metals tightly bonded to said carrier, and electrical terminal means for said alloy film.

"2. An article of manufacture comprising a non-conductive carrier having a tightly bonded conductive film thereon, said film comprising an alloy of at least two materials, one of said at least two materials having a positive coefficient of resistance, and the other of said at least two materials having a negative coefficient of resistance, said materials being proportioned in said alloy to produce a resultant coefficient of resistance of a predetermined value.

"3. The process of constructing a metallic film on a non-conductive carrier, comprising providing a mixture of at least two metallic organo-compound resinates of substantially stable and non-oxidizable alloyable metals, coating the non-conductive carrier with the mixture, drying the coated carrier and thereafter heating same to decompose the organoresinates and precipitate the metals therefrom as an alloy upon the non-conductive carrier and to remove any carbonaceous residue remaining after said precipitation."

In the brief filed on behalf of Weber et al. the subject matter is defined as follows:

"The invention covered by the counts relates to electrical resistance units and to the method of forming these units. In particular, the resistance units are of the type wherein the resistance element is formed as a thin metallic film deposited on the surface of a non-conducting carrier, such as a glass tube or a porcelain tube. The resistance element is formed by coating the surface of the carrier with a liquid solution formed of *a mixture* of two different metal resinates selected from the noble metal group and being *alloyable*. This coating is permitted to dry and is then heated or fired to a temperature sufficient to decompose the resinates and thereby precipitate a thin metallic film upon the surface of the carrier, the film being formed of an *alloy* of the two metallic resinates. The firing is at a temperature sufficient to remove any carbonaceous residue remaining in the precipitated film. [Italics quoted.]

"The Jira patent discloses the use of a mixture of gold resinate and palladium resinate, while Weber et al. discloses the use of a mixture of palladium resinate and platinum resinate.

"Counts 1 and 2 cover the resistance units which result from the process described above and count 3 covers the process."

The involved application of Weber et al. serial No. 2,705 was filed January 16, 1948, as a division of an application, serial No. 540,347, filed June 14, 1944, which matured into patent No. 2,529,436, issued November 7, 1950.

The involved application of the party Jira was filed March 7, 1945, and matured into patent No. 2,440,691, issued May 4, 1948.

The counts correspond to claims in the Jira patent No. 2,440,691, which were copied

into the Weber et al. application, serial No. 2,705.

■ Weber et al. received the benefit of the filing date of the parent application, serial No. 540,347, i. e., June 14, 1944, and thus became the senior party. Hence, Jira, as the junior party, had the burden of establishing priority in fact by a preponderance of evidence, provided the specification of the senior party's parent application was sufficient to support the counts.

In appellant Jira's reasons of appeal, numerous allegations of error are asserted, but the issues presented to us are epitomized in the brief on his behalf as follows:

"1. Jira contends that he has shown ample corroboration of a proper conception, diligence to a reduction to practice, and actual sale of merchandise made according to the counts in issue, all prior to the Weber et al. filing date. The Board has held that there is not proper corroboration.

"2. Jira contends that there is not a proper disclosure in the Weber and Griemsmann specification as required by R.S. 4888 to support the counts. The Board has ruled the disclosure to be sufficient, although conceding that Weber et al. is brief and uses words which are perhaps not well chosen."

In its decision, the board passed first upon the contention of Jira that there was not sufficient disclosure in the Weber et al. parent application to make claims corresponding to the counts, holding that the disclosure was sufficient.

In the brief for Jira before us that question is the last discussed.

If Jira's contention upon that point should be sustained, it would seem that a holding to that effect would be conclusive of the controversy and it would be unnecessary to consider whether the board erred in holding that there was lack of corroboration of Jira as to conception and reduction to practice.

We therefore follow the logical order which was adopted by the board.

The board discussed count 3 separately from counts 1 and 2, seemingly because a question was raised before it as to the propriety of including count 3 in the interference. (It was added in a redeclaration, only counts 1 and 2 having been included in the original declaration). After its discussion, the board ruled:

"For the above reasons we are of the opinion that the Primary Examiner was correct in permitting the amendment of the issue to include count 3 with the party Weber et al. in the status of senior party as to that count."

No issue as to that holding was presented before us and the issue as to disclosure relates to all three counts.

Upon this issue we quote the following from the board's decision:

"The basis of the objections of the party Jira goes to the identity of the solutions used in painting the carrier. The disclosure of the party Weber et al. is brief on this point and uses words which are perhaps not well choosen, but it is clear that the so called metallic solutions that are to be used are metal resinates and that the solutions contain two or more noble metals. If such materials were novel at the time of writing the specification and the film producing behavior of these substances were unknown, the description would be insufficient to enable a person of ordinary skill in the art to obtain the proper starting materials. However, from the testimony of Johnson, a witness called by the junior party, it is clearly established that resinates of the noble metals are commercial products that had been used many years prior to the entry of either of these parties into the field for the production of metal coatings on ceramics and glassware for ornamental purposes. It appears therefore that there was an established industry pertaining to these materials to which the reader of the specification could apply to obtain the materials and be informed of the general manner of their use to produce films on fire resisting bases. Since the applicant for a patent is not required to fully discuss or describe that which is well known, the specifica-

tion of the party Weber et el. cannot be held to be defective in this regard. With the nature of the material establishable, the steps and conditions of the process by which the metal film is produced upon the carrier is specifically given. There is no question therefore but what the specification of Weber et al. explicitly supports claims corresponding to counts 1 and 2."

Count 3 was then discussed, and under the ruling as to it, quoted supra, the holding as to counts 1 and 2 applies also to count 3.

The argument upon the point of disclosure in the brief for Jira is somewhat perplexing.

One of the witnesses called to testify in corroboration of Jira's testimony respecting his claimed conception, reduction to practice, etc., was Mr. Glenn F. Benkelman, President of Continental Carbon Company, assignee of the patent to Jira, Vice-President and Director of Research of that company.

In the brief it is alleged in substance that Weber et al. tell the public no more in their specification than was told to Jira and Benkelman by a Dr. Hovorka,[1] professor of Physical Chemistry at Western Reserve University, whom they visited in 1939, seeking certain information, an incident hereinafter again alluded to; that Weber et al. have failed to teach more than a naked suggestion;" that after a re-study of the Jira office actions and amendments for both Jira patents 2,281,843 (not involved here) and 2,440,691 (which is involved) "Jira is convinced that, had not this interference been declared and the Weber and Griemsmann application taken from the Examiner in charge, the specification would have been found insufficient;" that it is Jira's teaching that makes the Weber et al. specification understandable, if at all; and the brief continues:

"This study of the amount and type of knowledge which Mr. Benkelman

must possess to be a proper corroborating witness, and the study of the amount of teaching contained in the Weber and Griemsmann specification with respect to R.S.4888 leads Jira to believe that this Court should be faced with the choice of two conclusions. Either the Weber and Griemsmann specification is entirely inadequate since it is so very short and general in its suggestion that two noble metal resinate solutions can possibly be used to form a conductive film, or the very fact that Benkelman was possessed of the knowledge that Jira actually used two resinates instead of one, as the production methods were at that time, is sufficient corroboration. It seems inconceivable that such a short and general specification can be held to be adequate, and also hold that Benkelman could work in close harmony with Jira and not know what he was doing in sufficient detail to satisfy the counts in issue. The disclosure possessed by Benkelman from Jira is far more complete with respect to the subject matter of the counts than the disclosure of Weber et al., which, of necessity must support the counts to form a basis for the interference."

The purport of the argument taken as a whole seems to be, as is suggested in the answering brief for Weber et al., "to the effect that if the court finds the Weber et al. application disclosure to be adequate, it should also find that Mr. Benkelman had knowledge of Jira's invention sufficient for corroboration."

That argument seems to us to present a *non sequitur,* and we agree with the statement in the brief for Weber et al. that "there is no connection between the completeness of the Weber et al. disclosure and the question of fact concerning Mr. Benkelman's knowledge of Jira's invention prior to June 14, 1944."

█ The court would not be justified,

---

[1]. Jira testified that he contracted Dr. Hovorka who suggested the use of metal organosols for the purpose of precipitation of metals at low temperatures. He does not mention the time nor does he state that Benkelman was with him, but Benkelman testifies to a visit by himself and Jira to Dr. Hovorka in July, 1939.

particularly in view of the undisputed testimony of Jira's witness Johnson, referred to in the excerpt from the board's decision quoted supra, in holding that the board erred in its finding of sufficient disclosure in the parent application of Weber et al.

This brings us to the consideration of the first allegation epitomized in the brief for Jira from the numerous assignments of error embraced in his reasons of appeal to us, which, for convenience, we here repeat:

"1. Jira contends that he has shown ample corroboration of a proper conception, diligence to a reduction to practice, and actual sale of merchandise made according to the counts in issue, all prior to the Weber et al. filing date. The Board has held that there is not proper corroboration."

It should be understood that Weber et al. introduced no testimony and so are restricted to the filing date of their patent application for conception and reduction to practice, that date being June 14, 1944. No preliminary statement was filed on their behalf.

In Jira's preliminary statement he alleged:

"* * * that on or about the 16th day of March, 1940, he first made a written description of the invention; that on or about the 16th day of March, 1940, he first disclosed his invention to others; that on or about January 11, 1940, he received from the Harshal Chemical Company of Cleveland, Ohio the specific ingredients for constructing his invention; that on or about March 16, 1940, he reduced his invention to practice; and that on or about the 16th day of March, 1940, the said invention was first successfully tested in the city of Cleveland, County of Cuyahoga, and State of Ohio, and that he began actively exercising reasonable diligence in adopting and perfecting the invention on or about the 11th day of January, 1940, and that no drawing of the specific embodiment of the invention was made until application was prepared to file for patent protection."

It appears from the record that the Continental Carbon Company, hereinbefore-mentioned, a corporation of the state of Ohio, located at Cleveland, which is the assignee of the Jira patent here involved, was organized by Mr. Glen F. Benkelman in 1923. He became president of the company when it was organized and continued in that capacity, being such at the time he testified in this case in September, 1950. He graduated from Purdue University in 1914, receiving two degrees, both relating to engineering. Subsequent to his graduation, he worked for different companies as "engineer in charge of the laboratories and research work connected therewith," until he organized the carbon company.

Continental Carbon Company began making carbon composition resistors—i. e., electrical resistant devices having a film of carbon as the resistant element—in 1924.

In 1939–40, it developed a metal resistor which, according to the testimony, it began to sell in 1940. It was described by Benkelman in his testimony as "a single monofilm of palladium resinate type" and it was covered by patent 2,281,843, hereinbefore alluded to, issued to the party Jira May 5, 1942, and assigned to the Continental Carbon Company.

As we understand the case, the principal patentable distinction between Jira's patent 2,281,843 and his patent here involved, No. 2,440,691, is that the former was for a resistor film made from single metallic resinates, while the latter is for a resistor film made from a mixture of metal resinates forming an alloy.

A copy of patent No. 2,281,843 was introduced in evidence as Jira's Exhibit A, and a copy of patent 2,440,691 as Jira's Exhibit B.

Of Exhibit A Jira testified:

"This patent relates to the deposition of a single metal like palladium, or a metal of the noble metal group, upon a non-conductive carrier for the purpose of fabricating a resistor."

Of Exhibit B he said:

"Mainly what this patent introduces is the use of two or more noble metals in the fabrication of a resistor."

Asked to distinguish the patents, he said: " * * * in that first patent [Exhibit A] it naturally deals with only a single film, whereas the second patent [Exhibit B] deals with an alloy film."

He was asked what led him to make the invention of Exhibit B and he responded:

"Due to the fact that the first invention deals primarily with the deposition of a single coat, that unit had a temperature coefficient which was in excess of the temperature coefficient which we required for making resistors of very high accuracy. Therefore, in order to be able to control the temperature coefficient, as well as the low values that we were not being able to obtain with the use of the single film, led me to the use of an alloy film, such as is described in this patent."

At the time he testified in September, 1950 the party Jira stated that he was Vice President and Director of Research of Continental Carbon Inc.; that he had been connected with the company for 20 years; that he started as "plant hand, and was promoted to engineering, and then later in charge of the laboratory;" that he had been in charge of it for approximately 17 years; that he was a member of different engineering fraternity organizations and of the American Association for the Advancement of Science; and that his duties in charge of research were manyfold. He stated that he was an employee of the company and not an official at the time he made the invention here involved.

That he became an inventor is evidenced by several patents issued to him.

The question here is whether he was the first inventor of the subject matter involved in his patent 2,440,691 and, in the final analysis, that apparently is to be determined by ascertaining whether the evidence introduced to corroborate his own testimony meets the well established practice relating to corroboration in interference proceedings.

It is noted that in the brief for Weber et al. it is claimed in effect that Jira's own testimony taken in connection with experiments he claims to have performed would not establish conception of count 1 even if fully corroborated. It is conceded in the brief that one of the experiments upon which Jira relies would establish conception as to counts 2 and 3 "if properly authenticated and corroborated," but the claim of corroboration is vigorously challenged.

It is not clear to us from the decision of the board, whether or not the contention as to a lack of showing of conception by Jira was presented before the board, but however that may have been, the board, after briefly reviewing certain of the evidence adduced on behalf of Jira, stated:

"There is some dispute between the parties as to whether the process in which alternate layers of different metals produced, under the circumstances of the experiment, an alloy or merely a laminate of thin metal films. We do not consider it necessary to determine this question because it is our view that the testimony of Jira with respect to these experiments is uncorroborated and cannot therefore be accepted as either establishing conception or proving reduction to practice."

The board then reviewed the testimony respecting corroboration and held corroboration to be lacking.

It is obvious that if the board's decision on the question of corroboration is correct, the above-recited contentions are, so far as this proceeding is concerned, immaterial even if sound. Logically, therefore, the matter of corroboration should be given our first consideration.

Much of the evidence adduced on behalf of the party Jira is valueless because it relates to experiments made long subsequent to the dates named in his preliminary statement and subsequent to the filing date awarded Weber et al.

Upon the basis of his preliminary statement the material part of which is quoted, supra, his crucial date for both conception and reduction to practice is March 16, 1940, or at least not later than that date.

There was introduced in evidence as Jira's Exhibit H, a notebook which contained certain notations that he testified were

records of laboratory experiments carried out by him on four different days in March, 1940, viz., March 7th, 8th, 14th and 16th.

He testified that prior to those experiments, that is, in January, 1940, he had procured samples of resinates of so-called noble metals, such as palladium, gold, platinum and osmium for experimental use in the production of alloy film, from Harshaw Chemical Company of Cleveland, Ohio.

As to this testimony he was corroborated by Mr. Irwin E. Johnson, a research chemist for the Harshaw Company, to whose testimony allusion has hereinbefore been made in our discussion of the disclosure of Weber et al.

The following concession is made in a statement in the brief on behalf of Weber et al. before us:

"* * * for the purpose of simplifying the issue of priority, Weber et al. concedes that Jira's proofs, including Exhibits F1 to F5, G and W, together with the testimony of the witnesses Johnson and Griffith, are adequate to establish the fact that Jira had in his possession in early February, 1940, separate resinate solutions of gold, platinum, and palladium from which he could have made the invention in issue, but at that time Jira was making resistor films from single metallic resinates and *not from a mixture* of metal resinates to form an *alloy*." [Italics quoted.]

It is unnecessary to rehearse Jira's testimony relating to the experiments recorded in Exhibit H, nor is there the slightest disposition on our part to discredit it.

■ That conception and reduction to practice cannot be established upon the testimony of a party to an interference without corroboration by other evidence is so well settled as a fundamental of patent law, and is so familiar, that no citation of authority in support of the principle is deemed necessary. In the brief for Jira before us the principle is recognized in a statement reading:

"* * * The Rules of Interference practice are very exact by necessity, but application of these rules should not become so abstract as to depart wholly from the realm of reality."

As stated by the board:

"* * * The party Jira produced only two witnesses from among his associates who might have direct knowledge of these experiments. One of these, William M. Wood, was, in 1940, shipping clerk and order clerk. There is nothing in his testimony to indicate that he had any such direct knowledge of any experiments Jira might have made in 1940. The other witness, Glenn F. Benkelman, supervised, according to his testimony, the work of Jira which supervision consisted generally in receiving reports and consulting with Jira concerning the problems and progress of the work in Jira's departments."

In view of the vigor with which counsel for the party Jira press the corroborating effect of the testimony of Mr. Benkelman relative to the experiments in March, 1940, we reproduce that portion of his testimony which is quoted and emphasized in the brief for Jira:

"Q. 49. Will you state how you worked between yourself and Mr. Jira in the laboratory, particularly during the years 1939 and up to the present date? A. Mr. Jira was under my supervision. Those records were under my supervision, and we outlined the development project together. His records were under my scrutiny at all times.

"Q. 50. I hand you herewith Jira's Exhibit H, and ask you to state what it is? A. It is the record of his research work in connection with the development of the mental film resistors.

"Q. 51. And this record, Jira's Exhibit H, was made under your supervision? A. That's right.

"Q. 52. I direct your attention to sheet having entry dated March 7, 1940, and ask you to state what that entry relates to? A. It relates to the depositing of platinum-palladium films on a non-conductive carrier of a ceramic nature.

"Q. 53. Will you read the heading at the top of this entry dated March 7, 1940? A. 'Characteristics of Platinum-Palladium Films for X-Type Resistors.'

"Q. 54. Were the entries made on this sheet, dated March 7, 1940, made under your supervision? A. That's right.

"Q. 55. By whom were they made? A. Mr. Jira.

"Q. 56. Will you explain what metals were used for making the resistor on the entry date of March 7, 1940? A. Alloy platinum and palladium.

"Q. 57. Was that resistor, which was made on March 7, 1940, tested? A. Yes.

"Q. 58. Do the values on the entry for March 7, 1940, represent the values of that resistor that was made? A. Yes, sir.

"Q. 59. I call your attention to the entry bearing date March 16, 1940. Will you state what that entry represents? A. It represents characteristics of gold-palladium films deposited on non-conductive carrier.

"Q. 60. Was that entry made under your supervision? A. That's right.

"Q. 61. By whom was the entry made? A. Mr. Jira.

"Q. 62. Was the resistor made, as of this entry date, tested? A. That's right; it was tested.

"Q. 63. Do the values represented on the entry date, March 16, 1940, represent the value of that resistor? A. That's right.

"Q. 64. Would you say that the resistor made on the entry date, March 16, 1940, was successful? A. It was experimentally successful.

"Q. 65. With respect to entry date of March 7, 1940, would you say that resistor was successful? A. I would say it was experimentally successful.

"Q. 66. With respect to the other pages in the book, were they made under your supervision? A. Yes.

"Q. 67. By whom were they made? A. Mr. Jira.

"Q. 68. Do you know where these resistors which were made on March 7, 1940, and March 16, 1940, are? A. No; I have no idea where they are.

"Q. 69. With respect to the entries made on the other pages of the book, would you say that the values thereon represent the value of resistors that were made on that date? A. Yes, sir.

"Q. 70. That would be true for the single metal film resistors, as well as for the alloy film resistors? A. Yes."

It will be observed that there is no claim in the foregoing testimony that Benkelman ever saw the several entries made by Jira in the notebook, Exhibit H, prior to the filing date of the parent application of Weber et al. which was June 14, 1944. It is true that in answer to leading questions he stated that entries were made under his supervision, but that does not mean that they were made in his presence. If they had been made in his presence, undoubtedly, he would have so stated. Obviously, neither he nor Jira were tyros in the patent field. Jira testified on cross-examination that he was experienced in reading claims of patents.

Benkelman stated that the resistors were tested, but did not state when or where, nor was it anywhere stated by any witness that any experiments were conducted or any tests made in Benkelman's presence at any time prior to September 25, 1950, the day before the taking of the testimony on behalf of Jira began.

Of course, whatever may have been done at that time, or, in fact, at any time after the Weber et al. filing date, avails Jira nothing under the facts and circumstances of this case. It was well said by the board that It is a thoroughly settled principle of law that a reduction to practice cannot be established *nunc pro tunc.*

The following finding of the board is apt:

"* * * Benkelman did not testify that he saw the notebook of Jira prior to the filing date of the senior party although it is quite clear that

Benkelman, as of the time of taking the testimony, and in fact as of some time earlier, understood the nature of the invention and had taken the trouble to familiarize himself with Jira's case. There is nothing in his testimony to show that he obtained this information from Jira particularly with respect to alloy films at any date prior to the declaration of the interference."

Both Jira and Benkelman testified with respect to sales of resistors. A part of this testimony relates to sales of single metal resistor such as those covered by patent 2,-281,843 which tends to create confusion. Sales of single metal resistors have no bearing upon the question here involved.

Certain price lists dated November, 1940; February, 1942; and January, 1943, were introduced in evidence but they do not indicate in any way whether the film on the resistors was single or alloy. Jira testified on cross-examination that none of the company's advertising literature ever referred to a film formed of an alloy, and that their catalogues did not describe the nature of the film. "That," he said, "was our know-how. That is, we never divulged what we have done on our catalogue sheets".

The company, of course, has a perfect right to pursue the policy indicated, but when it does so its publications are of no aid in determining the intrinsic nature of the film on the resistors.

Jira testified in effect that alloy film resistors were manufactured and sold under the designation "X-type film precision resistors" beginning about December, 1941, and continuing thereafter. Jira and Benkelman both testified in effect that those sales were for experimental purposes, whatever that may mean.

Only one sales transaction was actually identified. There was introduced as Jira's Exhibit S, a paper stamped "Factory Order" bearing date of December 8, 1941, which, in the words of the board "was made the basis of testimony to the effect that resistors comprising an alloy film made according to the invention in issue were sold to Measurements Corporation, Boonton, N. J." We approve the finding of the board upon this phase of the case as expressed in the following:

"No testimony was introduced from the Measurement Corporation as to the use and performance of the resistors and although the witness Jira testified that complaints were received concerning the resistors he did not produce any of them nor did he produce any evidence to show when the experimental period terminated with the finding that the alloy film resistors were in fact practical. For these reasons the testimony relating to a sale of articles asserted to embody the invention in issue does not constitute proof of reduction to practice even though a specific customer has been identified."

The arguments on behalf of appellant before us have been carefully and respectfully considered. In our opinion, there is no reason to question the integrity or good faith of any witness in this case. Benkelman is doubtless a well-equipped scientist, fully capable of understanding what Jira did from an examination of documents and from descriptions given long after the experiments were performed, but under rules followed, so far as we are advised, from the very beginning of interference practice, that ability of itself does not qualify him as a corroborating witness. He did not witness the performance of the experiments.

The decision of the Board of Interference Examiners is affirmed.

Affirmed.