## SMITH v. NEVIN.
### Patent Appeal No. 3353.

Court of Customs and Patent Appeals.
Dec. 10, 1934.

Burnie J. Craig, of Pasadena, Cal., and Marie K. Saunders, of Washington, D. C. (Harold E. Allport, of Hollywood, Cal., of counsel), for appellant.

Ward, Crosby & Neal, of New York City, and Fisher & Pedersen, of Washington, D. C. (J. B. L. Orme, of New York City, of counsel), for appellee.

Before GRAHAM, Presiding Judge, and BLAND, HATFIELD, GARRETT, and LENROOT, Associate Judges.

GRAHAM, Presiding Judge.

The United States Patent Office declared two interferences. The first was between the application of the appellant, Arthur E. Smith, filed March 25, 1927, serial No. 178389, and an application of the appellee, Mendel Nevin, filed July 3, 1926, serial No. 120417, and was numbered 58513. The subject-matter of this interference was a combination of a hypodermic syringe and ampoule to be used therewith. This interference included one count and was declared June 18, 1929.

The other interference involved was declared June 30, 1930, and involved an application of the appellee, Mendel Nevin, filed June 4, 1928, and a patent issued to the appellant on June 25, 1929, No. 1,718,594, on an application filed March 24, 1927. This interference also contained one count, and was numbered 60100. On March 17, 1931, an additional count was added to said interference No. 58513 by the Examiner, pursuant to a decision of the Board of Appeals. Thereafter the Examiner of Interferences consolidated said interferences, renumbering

the counts. Count 3 of said interference was copied from the Smith patent 1,718,594. The parties to this consolidated interference had been involved in prior interferences, and a motion to dissolve on the ground of estoppel had been interposed in one of these interferences, and was renewed in the present appeal on priority, under the provisions of rule 130 of the Patent Office. In this appeal, the Board of Appeals denied the motion to dissolve.

No error is assigned by the party Smith on this action. It will therefore be considered as waived by him.

The counts of the interference are as follows:

"1. The combination of a syringe and an ampule, said ampule having a stopper movable therein, said stopper having a central recess therein, a plunger including a head and a shank mounted on said syringe, said plunger head being of a larger size than its shank and of less size than the bore of the ampule, said plunger having its end arranged to seat in said recess and an ampule engaging member surrounding said plunger shank and including a part movable within the syringe to engage the ampule in the barrel.

"2. The combination of a syringe and an ampule, said ampule having a stopper movable therein, said stopper having a recess therein, a plunger including a head and a shank mounted on said syringe, said plunger head being of a larger size than its shank and of less size than the bore of the ampule, said head having at least a portion of its sides tapered, said plunger having its ends arranged to seat in said recess and an ampule engaging member surrounding said plunger shank and including a part movable within the syringe to engage the ampule in the barrel.

"3. In a syringe, a barrel having a closure for one end thereof, said closure including an ampule holding member for engaging the end of an ampule, a plunger, said plunger being movable within said barrel and through said ampule holding member, a tip on said barrel, a needle on said tip, said tip having a tapered recess therein, an ampule in said barrel, said ampule including a hollow body portion and an end portion tapered to approximate the taper of said recess, a stopper in said body portion adapted to be engaged by said plunger, a resilient collar adapted to fit said tapered end portion of said body, said resilient collar being of a length greater than the thickness thereof and being adapted to fit within said tapered recess of said tip, whereby when pressure is applied to said ampule by said ampule holding member said resilient collar will be expanded in said recess without rolling and will engage the wall of said recess and the tapered end portion of the ampule to form a fluid tight seal between said ampule and said tip and releasable means to hold said ampule holding member in position."

The Examiner of Interferences found that the party Nevin should be restricted to his filing date for conception and reduction to practice, namely, July 3, 1926. He found also that the party Smith conceived his invention prior to November, 1922, but held that this was an abandoned experiment, and that the party Smith "slept on his rights until possibly spurred into activity by the sale to Smith's customers by Nevin of a syringe within the issue of the interference." Priority was therefore awarded to Nevin, the senior party. The Board of Appeals came to the same conclusion and affirmed the decision of the Examiner of Interferences.

Practically the only question upon this record is whether the appellant reduced his invention to practice in the latter part of 1921 and early part of 1922. In order to properly determine this matter, some view of the evidence must be had.

The parties in this interference are men of ability and high standing in their professions. The party Smith resides at Los Angeles, is a specialist in plastic oral surgery, and teaches, writes, and lectures extensively upon local anaesthesia and other subjects pertaining to his profession. He is a graduate of many educational institutions, and has lectured extensively throughout the United States and in Canada and Europe. For many years he attempted to develop instruments for use in his profession, and particularly hypodermic syringes and ampoules. The latter part of 1921 he developed and constructed a form of hypodermic syringe, which is thus described by him:

"The ampule was composed of glass, constricted at one end, I would call it the front end, into a taper; the other end, or rear end, was cut off; in other words not restricted. The tapered end contained a rubber band which was used as a gasket or washer. This rubber band or washer was approximately one-eighth of an inch in width and one or one and a half millimeters in thickness. It was located about one-half centimeter from the constricted glass tip. The rear end of

the ampule was closed by a rubber cork. The outer portion of this cork was located about two or three millimeters from the rear end. The cork contained a depression which was cylindrical. This depression extended almost through the cork. The ampule contained a liquid. The syringe was composed of metal— * * *

"The glass tip is broken off; the ampule is inserted into the rear end of the syringe; it is forced forward into the front end of the syringe, into a conical shaped depression; the conical shaped depression being located in the front end of the syringe; the taper or conical-shaped depression is practically the same as the taper on the front end of the ampule which contains the rubber band or washer. The rear end of the syringe is composed of a solid member, in which the plunger rod moves freely; the rear end, containing the plunger rod, is placed over the rear end of the ampule and is locked in position by a bayonet shaped construction; the locking of the rear member in the syringe forces the ampule forward, causing a compression of the rubber washer or band located around the tapered front end in the conical shaped depression on the front end of the syringe. This locks the ampule in position and compresses the rubber washer in the front end, to prevent leakage. The rear end of the ampule is closed by a cork, which acts, along with the plunger rod, as a piston; the cork in the rear end of the ampule contains a cylindrical hole or depression; the end of the plunger rod is fitted in the hole or depression in the cork; when pressure is exerted on the extreme end of the plunger rod, with the thumb or palm of the hand, the plunger tip adapts itself into the hole or depression in the cork, which centers and stabilizes the cork as it passes down into the ampule, for the purpose of discharging the contents of the ampule through the broken tip of the front end of the ampule, and through the small hole leading from the conical shaped front end of the syringe to the outer tip of said syringe. Forward pressure on the plunger rod and on the cork forces the ampule forward into the conical front end of the syringe, producing a fluid tight joint. * * *"

He constructed a syringe substantially as detailed by him above during November, 1921, and thereafter showed and explained it to many people who have testified in his behalf here. There seems to be no doubt of the conception and construction of this syringe at the time stated.

Dr. Smith, at this time, was under contract with the Dental Products Company, which company manufactured syringes, the plans for which were prepared by Smith. Shortly after the making of his first syringe above referred to, and which is known in this case as Exhibit 1, namely, in January, 1932, he had a conference with the officials of the Dental Products Company, and at that time had some difference of opinion with these officials as to the type of syringe which they should next manufacture. However, this disagreement finally resolved itself into an arrangement by which a different model of syringe was manufactured and sold, which syringe is the subject of reissue patent No. 17,906, and upon which the counts of the present interference do not read.

Smith was not satisfied with Exhibit No. 1, and continued his experimentation, and produced, during the first week of September, 1922, another syringe which is known in this record as Smith Exhibit No. 2, and which differed from the first embodiment of his ideas, particularly in that the barrel of the syringe was of the telescoping type so that it would take any sized ampoule, and, in that the end of the plunger was flattened on the sides so that it would fit into an elongated metal-lined recess in the top surface of the rubber plug in the ampoule, by means of which, when the plunger was inserted, the plug might become loosened within the ampoule with a slight turn, so that it would work more easily when pressure was applied. This syringe was also freely exhibited and explained to witnesses, who have testified to the same. In fact, it appears from the record that Dr. Smith, at times, became tiresome to his friends by his insistence upon showing them these syringes, or other similar instruments, on all possible occasions.

The only testimony in the entire record that we can find as to an attempt to reduce this syringe to practice is found in the testimony of the witness Harry E. Ransom, a dental surgeon, residing at Los Angeles, who testified that Dr. Smith, on one occasion, in September, 1922, showed him Exhibit No. 2. Ransom testified that Dr. Smith demonstrated the operation of this syringe to the witness "by taking a filled ampule, mounting the needle, and inserting the needle in an object and forcing the anaesthetic or liquid from the syringe. I remember of trying it, holding the needle between my fingers and testing the non-leaking feature of it."

No statement is made as to what object was used in this test, nor is there anything

elsewhere in the record indicating that any other test was ever made. During the period from the construction of these syringes, Exhibits 1 and 2, until the entrance of Nevin into the field in 1926, Dr. Smith had repeated opportunities to test these syringes. He was constantly engaged in lecturing, and was in constant contact with those who were using these instruments in their daily practice. While Dr. Smith repeatedly talked to oral surgeons about these syringes, so far as the record shows, he did not suggest that they be used, and he did not use them himself. His answer to inquiries as to why they were not used, both to those who inquired and in his testimony offered here, was that he did not consider them to be satisfactory. Parts of his testimony are as follows:

"Q. Did they proceed to manufacture your syringes? A. No.

"Q. State why. A. Because I was not satisfied, and I was continuing to do experimental work upon it, upon syringes and ampules. * * *

"A. * * * It delayed me because I did not want to file patents until I was sure it would work satisfactorily. I realized the expense of patents, and wanted to file as soon as I was sure that the device worked satisfactorily. * * *

"Q. Then I understand, Doctor, your testimony is that your inventions which constitute the subject matter of the counts of this interference were complete and finished in 1921 and 1922; is that correct? A. No.

"Q. When were they finished and complete? A. Just before filing my applications, to the best of my knowledge."

During the years from the construction of these two syringes up until the filing by Smith of his application herein, the testimony shows that Smith was continuously employed on various syringes which he was preparing, in the neighborhood of 100 different types. If there was anything further done on Exhibits 1 and 2 for at least four years, the record does not show it. When asked why he did not file applications as to Exhibits 1 and 2, his answer was: "The reason I did not file was because I was working almost continuously on various types of syringes."

Dr. Smith denied emphatically that he had abandoned his work as regards these particular syringes, but contended that he was communicating all the while with manufacturers of ampoules and rubber and other materials, so that he might obtain perfect materials as a result of which his syringe would be successful when put upon the market. Particularly was he delayed, he states, by the preparation of a glass which would not deteriorate or injure substances which were within the ampoules. This preliminary experimental work, it is contended, was necessary before applications might be properly filed.

The difficulty with this position is that there does not appear to be, in the counts of the interference, any reference of any kind to the material of which such ampoules, or rubber, or other materials might be made, so far as the composition thereof is concerned. There was therefore no delay necessary as to the subject-matter of the interference expressed in the counts now before us.

Dr. Smith was an experienced anæsthetist, and had administered hypodermic injections to thousands of patients. He was well aware of the difficulties to be encountered in using hypodermic syringes, especially in the oral cavity, to prevent leakage and consequent injury or discomfort to the patient. It is significant that, in all the years he was experimenting, he at no time used either of these syringes upon a patient, nor did he experiment with other animals, which, he testified, had been in his life a common practice when working upon other problems. That the difficulties encountered in using local anæsthetics are great is shown by the testimony of Dr. Hollenbeck, a witness called on behalf of Dr. Smith, and who testified, in part, in speaking of the use of a hypodermic syringe:

"* * * It is evident that if the plunger did not meet these requirements and could be distorted or upset when the injection is made, or if it adhered too tenaciously to the walls of the ampule, much force would have to be exerted during the injection, and it would be very difficult or impossible for the operator to inject the exact amount of anaesthetic required and to guage the resistance which the anaesthetic met when passing into the tissues, which is a matter of most vital importance."

It seems apparent that no physician or anæsthetist would be willing to make use of a hypodermic syringe without being thoroughly satisfied that it would perform its work satisfactorily. Some tests in actual practice are required. Such testimony as has been offered by the witnesses in this record, and as appears from the medical treatise offered on behalf of the party Smith, and which is his work, convinces the court that the simple tests made with Exhibits 1 and

944

2, as shown by this record, do not constitute a reduction to practice of the invention at issue.

The question as to whether an invention has been reduced to practice is one dependent to a considerable degree upon the article or process which is involved in the inventive idea. Thus one invention may be held to be reduced to practice by a simple construction of the same, while another may require actual use under normal working conditions. It is the latter class which includes the invention now before us.

"A conception of the mind is not an invention until represented in some physical form, and unsuccessful experiments or projects, abandoned by the inventor, are equally destitute of that character." Clark Thread Co. v. Willimantic Linen Co., 140 U. S. 481, 489, 11 S. Ct. 846, 849, 35 L. Ed. 521; Lowe v. Pacific Gas & Electric Co. (D. C.) 2 F.(2d) 157.

"A machine is reduced to practice when it is assembled, adjusted and used." Corona Cord Tire Co. v. Dovan Chemical Corp., 276 U. S. 358, 383, 48 S. Ct. 380, 387, 72 L. Ed. 610.

If the inventor, at the time of his conception and test did not consider the test successful, the court cannot be called upon, at a later date, to give this test a status which the inventor did not attribute to it at the time. Halbleib v. Bendix, 50 App. D. C. 247, 270 F. 683.

On numerous occasions, the Court of Appeals of the District of Columbia, our predecessor in this jurisdiction, as well as this court, has stated that the test of successful reduction to practice is a test under actual working conditions. Wickers v. McKee, 29 App. D. C. 4; Malcom v. Richards, 47 App. D. C. 582; Jardine v. Hartog, 36 F.(2d) 606, 17 C. C. P. A. (Patents) 764; James v. Stimson, 49 F.(2d) 493, 18 C. C. P. A. (Patents) 1255; Gamble v. Church, 57 F.(2d) 761, 19 C. C. P. A. (Patents) 1145; Fink v. Humel, 70 F.(2d) 115, 21 C. C. P. A. (Patents) 1057; Payne v. Hurley, 71 F.(2d) 208, 21 C. C. P. A. (Patents) 1144; Urschel v. Crawford, 73 F.(2d) 510, 22 C. C. P. A. (Patents) ——.

The appellant, being the first to conceive, but having failed to reduce his invention to practice prior to the filing date of the appellee, had imposed upon him the burden of establishing diligence on his part from a date immediately prior to appellee's entrance into the field, until appellant filed, or, approximately, a period of eight months. On this record, we agree with the tribunals below in the conclusion that he has failed to sustain this burden.

Priority was properly awarded to the senior party, Nevin, on all the counts of the interference, and the decision of the Board of Appeals is affirmed.

Affirmed.