ARMOUR AND COMPANY, Plaintiff,

v.

WILSON & CO., Inc., Defendant.

No. 56 C 1206.

United States District Court
N. D. Illinois, E. D.

Nov. 21, 1958.

**354**

Horace Dawson and Timothy L. Tilton, Dawson, Tilton, Fallon & Lungmus, Chicago, Ill., for plaintiff.

R. Howard Goldsmith, Schneider, Dressler, Goldsmith & Clement, Chicago, Ill., R. T. McLean, Adams, Forward & McLean, New York City, Thomas Freeman, Chicago, Ill., for defendant.

PERRY, District Judge.

This matter came on to be heard on the complaint and the answer thereto.

Involved in this action are two patents, namely, Patent No. 2,669,537, known as the Thompson patent, and Patent No. 2,669,536, known as the Bunding patent.

The court has heard the testimony of the witnesses, has examined and considered the exhibits offered and received in evidence, and has heard oral argument of counsel. Upon careful consideration of the record in this cause, as well as of the plaintiff's objections to proposed Findings of Fact and Conclusions of Law submitted herein by defendant, the court finds as follows:

Findings of Fact—Thompson Patent

1. Plaintiff owns the Thompson patent in suit, No. 2,669,537, which issued on February 16, 1954 (P. Ex. 1A) on a continuation-in-part application, filed December 27, 1952 (P. Ex. 1C) which was partly based on an earlier application filed August 14, 1950 (P. Ex. 1B).

*I. There Is No Invention In The Thompson Patent*

2. The hormone ACTH was known long prior to the Thompson patent (Tr. 925; 1174), but the medical profession was unaware of a use for ACTH until Dr. Hench of the Mayo Clinic published his Nobel prize-winning work in the spring of 1949 showing the usefulness of ACTH in the treatment of rheumatoid arthritis (Tr. 926; 1174).

3. Shortly thereafter, in June, 1949, Dr. Klein of the Wilson Laboratories discussed with Dr. Wolfson the use of gelatin with ACTH to prolong its activity and thereby increase its effectiveness (Tr. 927–928; 1267–1268).

4. Long prior to the Thompson patent, gelatin was well known as a vehicle to increase the effectiveness of drugs, being used "as a vehicle for subcutaneous injections when slow absorption of a drug is desired" (D. Ex. 7, p. 496; Tr. 1332–1342; 165–166). Gelatin was used as a retarding agent both with and without additional ingredients just as in the Thompson patent. Examples of the use of gelatin without additional ingredients were shown in the literature with respect to insulin (D. Ex. 60), epinephrine (D. Ex. 64) amphetamine (D. Ex. 66), pollen extracts (D. Ex. 68), penicillin (D. Ex. 71; D. Ex. 75), heparin (D. Ex. 75) and tubocurarine (D. Ex. 75). Examples of the use of gelatin along with other ingredients were shown in the literature with respect to epinephrine (D. Ex. 62; D. Ex. 67; D. Ex. 69; D. Ex. 80), heparin (D. Ex. 65; D. Ex. 70; D. Ex. 73; D. Ex. 74; D. Ex. 78; D. Ex. 80), tubocurarine (D. Ex. 76), codeine and morphine (D. Ex. 77; D. Ex. 79; D. Ex. 80), suprarenin (adrenalin), digitalis, ephedrine, morphine, codeine, strychnine, strophanthin, belladonna, caffein, pituitrin, antuitrin, pitressin, pitocin and "substantially all water soluble drugs suitable for subcutaneous and intramuscular injection" (D. Ex. 81).

5. The gelatin so used (both with and without other ingredients) was long known to cause between twofold and eightfold increase in effectiveness of the drugs (Tr. 1025–1035; D. Ex. 47 & 47A; D. Ex. 48 & 48A).

6. The action of gelatin with ACTH is satisfactorily explained solely on the basis of retardation of absorption (Tr. 977; 1342–1343; 501). Dr. Thompson in a communication within the Armour organization stated:

"The effect of gelatin on ACTH action can be quite satisfactorily explained on the basis of absorption control alone" (Tr. 660–661; D. Ex. 15, p. 1).

7. Gelatin acts in the same manner with ACTH as it was long known to act with other drugs. Dr. Cluxton, plaintiff's then director of medical research, stated in an internal memorandum:

"Gelatin is such a well known substance that only the pertinent qualities of this vehicle as concerns ACTHAR will be briefly mentioned. It may be administered intramuscularly or subcutaneously. Among the outstanding physical properties of gelatin is its stability in extreme temperatures and its broad solvent properties. It is an excellent viscous colloid permitting prolonged action of ACTHAR as well as heparin and other pharmaceutical products." (D. Ex. 58, p. 2).

8. The Thompson patent describes and claims the use of ACTH with gelatin with or without additional ingredients. Examples I–III of the patent describe compositions containing ACTH, gelatin and phenol; Example IV describes an ACTH preparation with aluminum phosphate and the well known Pitkin's menstruum (gelatin, dextrose, and acetic acid-D. Ex. 81; Tr. 638–642); Examples V–VII describe ACTH-gelatin preparations which include procaine hydrochloride, Chlorobutanol trisodium phosphate, aluminum phosphate and polyvinyl pyrrolidone (PVP).

9. Claims 1 and 2 of the Thompson patent are directed to ACTH-gelatin compositions broadly, i. e. with or without additional ingredients; claims 3–7 are directed to ACTH-gelatin compositions plus additional ingredients such as PVP or aluminum phosphate.

10. Thus, the subject matter described and claimed in the Thompson patent is nothing more nor less than the use of the well known vehicle—gelatin—with ACTH, the therapeutic usefulness of which had become known through Hench's work but a short time before. Such use of a well known vehicle did not constitute invention.

11. This finding of no invention is in full accord with the testimony of witnesses for both the plaintiff and defendant. These witnesses, all men skilled in the art, agreed that the use of gelatin with ACTH was "common sense, simply because everybody knew about the possibility of using gelatin as a long-acting agent" (Wolfson—Tr. 1298–1299; Forsham—Tr. 165; Frawley—Tr. 420; Fisher—Tr. 859; and Hier—Tr. 1043). Dr. Leake, defendant's expert who spent his distinguished career working with pharmaceutical products (Tr. 1330–1331), and the only witness who was not cross-examined, testified to the same effect (Tr. 1342).

12. It was not inventive to do the obvious, i. e., use common sense, and the Thompson patent represents nothing more than this.

II. *Thompson Was Not An Original And First Inventor*

13. As a result of the discussion between Klein and Wolfson in June of 1949 (See Finding 3), Dr. Wolfson requested non-antigenic gelatin from Dr. Klein by a letter dated July 26, 1949 (D.Ex. 32) and Dr. Klein shipped such gelatin to Dr. Wolfson on September 12, 1949 (Tr. 930–931; 1270; D.Ex. 34).

14. The first clinical use of gelatin with ACTH was made by Dr. Wolfson on his patient Loidl on September 27, 1949 (Tr. 1273–1274; D.Ex. 59).

15. About October 1, 1949, Dr. Thompson was informed of Dr. Wolfson's work with long acting ACTH and started cooperative work with him (Tr. 591–593; D.Ex. 8, p. 2).

16. On October 20, 1949, Dr. Thompson's notebook reveals that "Dr. Wolfson suggested combining all the known effective delaying agents, trying the combination clinically and, by elimination, try to arrive at an effective preparation" (D.Ex. 10, p. 157–158).

17. Dr. Thompson's first written entry suggesting the possible use of gelatin with ACTH appears in his notebook on November 22, 1949 (Tr. 601; D.Ex. 10, p. 166; D.Ex. 8, p. 2). This was after several discussions with Dr. Wolfson and after Dr. Wolfson's use of gelatin with ACTH on his patient, Loidl.

18. The common sense concept of using gelatin with ACTH was known to Dr. Klein and Dr. Wolfson prior to any such concept by Dr. Thompson, and an ACTH-gelatin preparation was used by Dr. Wolfson on his patient Loidl prior to the preparation of any such composition by Dr. Thompson.

19. Dr. Thompson was not an "original and first inventor" [1] of gelatin with ACTH.

### III. The First Commercially Accepted Product Was Developed By Defendant

20. In June, 1951, Dr. E. B. Astwood published a paper teaching the use of a method of purifying ACTH with oxycellulose (Tr. 825–826; 1189–1190; D. Ex. 57). Prior to Dr. Astwood's publication, defendant had been working with Dr. Astwood and knew of the oxycellulose method of purification (Tr. 934–935; 1188–1190).

21. On June 20, 1951, Wilson prepared an ACTH preparation containing gelatin, Astwood ACTH and 0.5% phenol (Tr. 934–936). This material was sent for clinical testing to Dr. Wolfson on October 1, 1951 (Tr. 937) and to Dr. Forsham on December 17, 1951 (Tr. 936).

22. In the fall of 1951, Armour marketed an ACTH preparation containing crude ACTH, gelatin, trisodium phosphate and propylene glycol (Tr. 549; 552–553; 42). This preparation (known as ACTHAR GEL—Tr. 834) was unsatisfactory (Tr. 171; 839; 1315; D.Ex. 53).

23. On December 27, 1951, plaintiff was advised by Dr. Forsham that the Wilson gelatin-ACTH preparation was far superior to Armour's ACTHAR GEL (Tr. 171–176; D.Ex. 22; D.Ex. 53).

24. Immediately thereafter, early in January, 1952, Armour obtained from Dr. Wolfson samples of the Wilson ACTH-gelatin preparation (Tr. 831–835; D. Exs. 23, 24, 25 and 26).

25. Commercial gelatin preparations of the type presently marketed, which contain Astwood ACTH, gelatin and phenol were prepared by Wilson prior to any preparation of such products by Armour, and were prepared by Armour only after Armour had received a sample of the Wilson product from Dr. Wolfson.

### IV. The Thompson Patent Is Barred By The Statute

26. The original Thompson application filed on August 14, 1950 (P. Ex. 1B) contained no example of the use of gelatin and ACTH without either aluminum phosphate or PVP (Tr. 1457–1458). Not until December, 1952, when Dr. Thompson filed his continuation-in-part application (P. Ex. 1C) did any patent application of Dr. Thompson contain examples of ACTH, gelatin and phenol without other ingredients (Tr. 1457–1460), and by that time, the Wilson product was already on the market (Tr. 1457).

27. Armour marketed an ACTH-gelatin composition in the fall of 1951 (Finding 22) more than a year prior to the date of filing of the Thompson continuation-in-part application of December 27, 1952 (Tr. 549; 552–553; 42). This was "public use" [2] more than one year prior to Thompson's effective filing date.

1. 35 U.S.C. § 115.

2. 35 U.S.C. § 102(b).

### V. Improper Claim of Inventorship

28. In January, 1950, Dr. Wolfson suggested to Dr. Thompson that PVP be used with ACTH to retard the absorption of ACTH (Tr. 603; 605; D.Ex. 8, p. 5); Armour immediately cabled Europe to obtain PVP for experimental use (D.Ex. 8, p. 4).

29. After Dr. Wolfson suggested the combination of ACTH and PVP to Dr. Thompson, plaintiff arranged to have Dr. Wolfson disclaim inventorship (D. Ex. 11; 12; 13). Dr. Thompson thereafter claimed ACTH and PVP as his invention in his original application filed in August, 1950 (Tr. 605; P. Ex. 1B, claim 11, p. 25).

30. Dr. Thompson continued his attempt to obtain a patent on ACTH and PVP until May, 1958 (Tr. 645; D. Ex. 18).

31. The use of PVP with ACTH was not the invention of Dr. Thompson. Plaintiff's action in seeking to patent it as a Thompson invention was wrongful.

### VI. Improper Prosecution Of The Thompson Application—Rat Test

32. Thompson's original patent application was rejected by the Patent Office as being unpatentable over the art which taught the use of gelatin as a retarding agent (P. Ex. 1B, p. 47). To overcome this rejection, Thompson filed an argument in the Patent Office on June 5, 1952, alleging that gelatin did not act as a retarding agent with ACTH because gelatin with ACTH

"causes a sudden and immediate strong response, and in addition, a response which is greater at any point on the curve than that caused by an identical dose of ACTH in saline" (P. Ex. 1B, p. 51).

This argument was based on an affidavit of Thompson, dated May 29, 1952, which contained the results of a rat test ostensibly comparing ACTH in gelatin with ACTH in saline (P. Ex. 1B, p. 55–61).

33. The Thompson affidavit was refiled in the continuation-in-part application (P. Ex. 1C, p. 21, 27–34) and the conclusions of the affidavit were set forth in the specification of the continuation-in-part application (P. Ex. 1C, p. 3–4) and, eventually, in the patent. The patent as issued asserts that ACTH-gelatin preparations produce

"immediately upon injection, a sudden strong response which is substantially in excess of the response caused by an equal dose of the same substance in an aqueous solution from which the gelatin is omitted".

The patent also asserts that gelatin-ACTH gives a response which is always stronger at any point of time than an equivalent dosage of saline-ACTH, and this is based on a

"unique property of the gelatin which is displayed when the gelatin is used in combination with the adrenocorticotrophic hormone".

This alleged "unique" property of gelatin is also referred to as "potentiation" (Patent, column 2, lines 14–38).

34. These assertions were based on a single test in rats (Tr. 663; 666; 706–709).

35. Contrary to the statement made to the Patent Office in Thompson's affidavit that his rat test compared ACTH in gelatin with ACTH in saline, the test actually compared ACTH in a gelatin-phenol vehicle with ACTH in a saline vehicle without phenol (Tr. 663; 676; 681–82; 707–8).

36. Wilson conducted numerous rat tests, including an *inter partes* test. The Wilson tests employed many rats and compared all four vehicles; the result is always the same—both saline plus phenol and gelatin plus phenol show a greater response than the two vehicles without phenol (Tr. 1008–1017; D. Ex. 39 & 39A; 40 & 40A; 41 & 41A).

37. Thompson's misleading affidavit was filed despite the fact that he had been earlier advised by Dr. Forsham that phenol had an effect (Tr. 674–676; D. Ex. 17).

38. The only rat test produced by Thompson comparing all four vehicles (saline, gelatin, saline plus phenol, and

gelatin plus phenol), was assay 68 performed in 1955 (Tr. 696; D. Ex. 19 with chart reproduced as D. Ex. 42 & 42A); this single Armour test shows, just as the many Wilson tests, that saline with phenol produces an equivalent response to gelatin with phenol (Tr. 688; 1014–1015).

39. Plaintiff introduced recently made clinical tests during the course of the trial, but the earliest determinations made in these tests were after eight hours except for Dr. Frawley's four hour eosinophil test (Tr. 702; 706) which showed other vehicles to be more effective than gelatin (Tr. 432–433) and which were asserted by plaintiff not to be a useful index of ACTH activity (Tr. 379; 387). The evidence with respect to humans establishes from plaintiff's own witness, Frawley, that with ACTH in gelatin, the effect does not appear quite as suddenly, but does appear to last longer than with ACTH in saline (Tr. 445); Thompson refused to state whether or not he agreed with this evidence (Tr. 728). Thompson was an evasive and equivocating witness.

40. Thompson's assertion in his patent that gelatin is "unique" and exerts a "sudden strong response" was based on the single affidavit test in rats and this single test was false and misleading.

### VII. Improper Prosecution Of The Thompson Application— Gelatin vs. PVP

41. When Thompson filed his continuation-in-part application in December, 1952, he made a new assertion, not found in his original application (P. Ex. 1B), that there was a difference between gelatin on one hand and "retarding agents" on the other hand, one of such "retarding agents" being PVP (patent, column 4, lines 43–65).

42. When Thompson first told the Patent Office that there was a difference between gelatin and PVP, he well knew the statement was false, indeed he had conducted an experiment comparing the effect of ACTH with gelatin and ACTH

with PVP (D. Ex. 16, reproduced in D. Ex. 45 & 45A) and determined that PVP acted in the same manner as gelatin (Tr. 546–547; 665–667; 718–719; 732–733; 1010–1020).

43. In application serial number 352,290 which Thompson filed on the combination of ACTH and PVP (see finding 30, above) he asserted that PVP gave a sudden strong response which is prolonged for a doubly extended period (Tr. 668–670; D. Ex. 18, p. 47, 50); this is essentially the same assertion that Thompson made with respect to the action of gelatin in attempting to convince the Patent Office that gelatin was "unique" and differed from "retarding agents" such as PVP.

44. Thompson furnished false and misleading information to the Patent Office, knowing it to be false and misleading, when he asserted in his continuation-in-part application and ultimately in his patent that gelatin was "unique" in its action and differed from "retarding agents" such as PVP.

### Conclusions of Law— Thompson Patent

1. The claims of the Thompson patent are invalid because the use of gelatin with ACTH was obvious (common sense) to those skilled in the art. 35 U.S.C. § 103; Vischer Products Co. v. National Pressure Cooker Co., 7 Cir., 1949, 178 F.2d 125, 126; Blanc v. Spartan Tool Co., 7 Cir., 1948, 168 F.2d 296, 300; Frederick Stearns & Co. v. Grove's Laboratories, 8 Cir., 1937, 87 F.2d 822, 824.

2. The use of gelatin with ACTH is merely an analogous use for gelatin, a substance well known to increase the effectiveness of drugs, and such use of gelatin does not amount to invention. Mandel Bros., Inc. v. Wallace, 1948, 335 U.S. 291, 296, 69 S.Ct. 73, 93 L.Ed. 12, 16; Dow Chemical Co. v. Halliburton Oil Well Cementing Co., 1945, 324 U.S. 320, 327–328, 65 S.Ct. 647, 89 L.Ed. 973, 979–980; Hotchkiss v. Greenwood, 1850, 11 How. 248, 266–267, 13 L.Ed. 683, 691.

3. The claims of the Thompson patent are invalid for lack of invention over the prior art. Mandel Bros., Inc. v. Wallace, 1948, 335 U.S. 291, 295, 69 S.Ct. 73, 93 L.Ed. 12, 15.

4. Even if it be assumed that gelatin was discovered by Thompson to possess characteristics in addition to its well known retarding characteristics, the discovery that gelatin possessed these characteristics does not amount to invention, inasmuch as gelatin was long known to increase the effectiveness of other drugs and would be expected to increase the effectiveness of ACTH. The discovery of a function is not patentable. Funk Brothers Seed Co. v. Kalo Inoculant Co., 1948, 333 U.S. 127, 132, 68 S.Ct. 440, 92 L.Ed. 588, 593.

5. The Thompson patent is invalid because Thompson was not the original and first inventor of the subject matter thereof. 35 U.S.C. § 102(f); 35 U.S.C. § 115; City of Milwaukee v. Activated Sludge, 7 Cir., 1934, 69 F.2d 577, 587; Pointer v. Six Wheel Corp., 9 Cir., 1949, 177 F.2d 153, 157; Welch v. Grindle, 9 Cir., 1957, 251 F.2d 671, 674.

6. Claims 1 and 2 of the Thompson patent, which include the use of gelatin in ACTH without added ingredients, are not entitled to the filing date of Thompson's parent application in August, 1950, because the parent application did not teach the use of ACTH in gelatin without added ingredients. Young v. General Electric Co., D.C.N.D.E.D.Ill. 1951, 96 F.Supp. 109, 132; Philip A. Hunt Co. v. Mallinckrodt Chemical Works, 2 Cir., 1949, 177 F.2d 583, 586–587; Benz v. Celeste Fur Dyeing & Dressing Corp., 2 Cir., 1946, 156 F.2d 510, 512.

7. The Thompson patent is invalid because Armour publicly sold ACTH-gelatin compositions in the fall of 1951, more than a year prior to the filing date of Thompson's continuation-in-part application filed in December, 1952. 35 U.S.C. § 102(b);[3] Egbert v. Lippmann, 1881, 104 U.S. 333, 26 L.Ed. 755; Na-Mac Products Corp. v. Federal Tool Corp., 7 Cir., 1941, 118 F.2d 167, 171–172; Philip A. Hunt Co. v. Mallinckrodt Chemical Works, 2 Cir., 1949, 177 F.2d 583, 586–587; Benz v. Celeste Fur Dyeing & Dressing Corp., 2 Cir., 1946, 156 F.2d 510, 512.

8. The Thompson patent is invalid because Thompson's original application claimed that Thompson was the inventor of ACTH and PVP, which was the suggestion of Dr. Wolfson. 35 U.S.C. § 102 (f); Precision Instrument Mfg. Co. v. Automotive Maintenance Machinery Co., 1945, 324 U.S. 806, 816, 818, 65 S.Ct. 993, 89 L.Ed. 1381, 1387, 1388; Interstate Bakeries v. General Baking Co., D.C.D. Kan.1948, 84 F.Supp. 92, 101 (findings 31–33), 104–5 (conclusions 1–3).

9. The Thompson patent was secured after furnishing the Patent Office with false and misleading evidence and statements, and this invalidates the Thompson patent. Precision Instrument Mfg. Co. v. Automotive Maintenance Machinery Co., 1945, 324 U.S. 806, 816, 818, 65 S.Ct. 993, 89 L.Ed. 1381, 1387, 1388; Hazel-Atlas Glass Co. v. Hartford-Empire Co., 1944, 322 U.S. 238, 64 S.Ct. 997, 88 L.Ed. 1250; Keystone Driller Co. v. General Excavator Co., 1933, 290 U.S. 240, 54 S.Ct. 146, 78 L.Ed. 293; Floridin Co. v. Attapulgus Clay Co., D.C.D.Del. 1940, 35 F.Supp. 810, 814.

10. Commercial success will not serve to validate an otherwise invalid patent. Dow Chemical Co. v. Halliburton Oil Well Cementing Co., 1945, 324 U.S. 320, 330, 65 S.Ct. 647, 89 L.Ed. 973, 981; Vischer Products Co. v. National Pressure Cooker Co., 7 Cir., 1949, 178 F.2d 125, 126; Harley C. Loney Co. v. Ravenscroft, 7 Cir., 1947, 162 F.2d 703, 709.

---

3. Note that the present statute provides for a *one* year period of public use, rather than two years as in the older statute.

**360**

### Findings of Fact—Bunding Patent

1. Plaintiff owns the Bunding patent in suit, No. 2,669,536, which issued on February 16, 1954 (P. Ex. 2A) on an application filed August 15, 1950 (P. Ex. 2B).

2. The Bunding patent describes a method of purifying ACTH by adsorbing the ACTH on an adsorbent and then eluting the ACTH therefrom in more purified form.

3. The three claims of the Bunding patent call for adsorption on "cellulose material", the pH of adsorption being above 3 and the pH of elution being below the pH of adsorption and within the range of 1.0 to 4.5.

4. The essential features of the Bunding patent are (a) the use of a "natural cellulose" adsorbent and (b) the use of a mild acid solution for adsorption and a strong acid solution for elution (Tr. 782).

5. The only "natural cellulose" adsorbents referred to in the Bunding patent are Solka Floc and filter paper (Tr. 783; 785).

6. Defendant is charged with infringement of all three claims of the Bunding patent, but only for a period from March 30, 1954, to September 23, 1954, when defendant used an adsorption pH above 3.0 (Plaintiff's trial brief, p. 6; Tr. 21, Tr. 792; P. Ex. 31).

### I. Defendant Does Not Infringe The Bunding Patent

7. In June, 1951, Dr. E. B. Astwood of Boston published a paper in the Journal of the American Chemical Society, describing a process for the purification of ACTH employing oxycellulose as an adsorbent (Tr. 1189–1190; 985; D.Ex. 57).

8. Defendant adopted the Astwood process for purification of ACTH and has always used oxycellulose as an adsorbent (Tr. 934; 984–985).

9. Defendant obtains approximately the same yield of purified ACTH per pound of pituitary glands (18,000–27,000 subcutaneous units—Tr. 1036; 6,000–9,000 intravenous units—Tr. 1025) employing oxycellulose powder at a pH sometimes below 3 and sometimes above 3 (Tr. 973; 969) as plaintiff obtains at a pH of 4 (8,000 intravenous units—Tr. 802) using oxycellulose gauze (Tr. 786).

10. The Bunding patent does not mention oxycellulose (Tr. 822–823) or suggest its use (Tr. 1163); Bunding never used oxycellulose (Tr. 904).

11. Armour was unaware of work done with oxycellulose before Dr. Astwood's publication (Tr. 803). Immediately after publication of Dr. Astwood's article, Dr. Fisher of Armour was notified of the article, Dr. Hays of Armour went to see Dr. Astwood, and Armour adopted the Astwood process (Tr. 825–826).

12. The Bunding patent application as originally filed claimed "an adsorbent" or "paper" (P. Ex. 2B, p. 14–15). Promptly after publication of the Astwood article, Bunding amended his claims to substitute the term "cellulose material" for the terms "an adsorbent" and "paper" (P. Ex. 2B, amendment filed August 2, 1951, p. 20–26, and subsequent amendments).

13. In his arguments attempting to distinguish over the prior art, Bunding alleged, in addition to arguments with respect to pH, that there was patentability in the "specific adsorbents" and "limited group of adsorbents" employed by Bunding (P. Ex. 2B, p. 25, 33, 38) which were, of course, only Solka Floc and filter paper (Tr. 783; 785).

14. The Bunding patent is not infringed by defendant unless the term "cellulose material" appearing in each of the claims includes oxycellulose.

15. Plaintiff agrees that the use of oxycellulose was the invention of Dr. Astwood (Tr. 822; 862–863; 1474) and that the use of oxycellulose is the Astwood method, irrespective of the pH employed (Tr. 828). Plaintiff acknowledged that Dr. Astwood is one of the most capable medical scientists in America today (Tr. 863); Dr. Astwood did not

apply for a patent on his invention of the use of oxycellulose (Tr. 1484) thereby making it freely available to the world.

16. Oxycellulose is not "natural cellulose", which is an essential feature of the Bunding patent (Tr. 782); oxycellulose is cellulose which has been oxidized by nitrogen dioxide (Tr. 786; 988).

17. Oxycellulose is a different chemical substance than natural cellulose (Tr. 1155). Oxycellulose contains acid carboxyl groups and dissolves in sodium hydroxide, whereas cellulose is not acid and will not dissolve in sodium hydroxide (Tr. 1000–1002; D. Ex. 51 & 52).

18. The Bunding patent calls for 50 grams (50,000 milligrams) of cellulose to purify one gram of ACTH, whereas only .08 grams (80 milligrams) of oxycellulose are used to purify the same amount of ACTH, i. e., 625 times as much cellulose as oxycellulose is required to purify an equivalent amount of ACTH (Tr. 805–808; 976; 990–991; D.Exs. 20 & 21; D. Exs. 35, 36 & 37 reproduced in photograph, D. Ex. 38).

19. The tiny amount of oxycellulose used to purify 1 gram of ACTH (80 milligrams) gives far greater purification than the large amount of Solka Floc (50,000 milligrams). (Tr. 992).

20. If oxycellulose is substituted for cellulose and used in accordance with the process set forth in the Bunding patent, no purification is obtained (Tr. 997–999).

21. If the term "cellulose materials" includes materials other than "natural cellulose" referred to in the Bunding patent it equally includes materials such as wood flour (Tr. 904; 815; 992), cellophane (Tr. 993; 1212–1213) and many other materials which include the term "cellulose" as a part of their names, such as cellulose acetate butyrate (Tr. 995; 814; 905) all of which will not work (Tr. 992–997; 814; 905).

22. Claims of the Bunding patent call for elution from the adsorbent at a pH between 1.0 and 4.5; when ACTH is adsorbed on oxycellulose, it cannot be eluted from the oxycellulose at a pH of 4.0 (Tr. 858), showing that oxycellulose is not equivalent to cellulose.

23. Oxycellulose is not "cellulose material".

24. The Bunding patent is not infringed by defendant's purification process employing oxycellulose.

II. *Bunding Was Not The First Inventor*

25. About the middle of August, 1949, Bunding noted that ACTH could be adsorbed on cellulose at a pH of 2.5 (Tr. 872–873; P. Ex. 32, p. 257–260, Expt. 61A). On August 31, 1949, Bunding did some work on paper strip chromatograms, but could not tell which component was ACTH and which component was an impurity (Tr. 870–871; 873–874; P. Ex. 32, p. 270–273, Expt. 65A). Paper strip chromatography was a well known and commonly used technique in 1949 (Tr. 906–907). As of August 31, 1949, Bunding had no conception of the invention claimed in his patent.

26. Bunding's next work appears in an undated paper strip chromatographic experiment (the samples were assayed on December 30, 1949) wherein Bunding learned that ACTH could be adsorbed on cellulose and separated from its impurities, but no mention is made as to the adsorption pH (Tr. 874–876; Tr. 912; P. Ex. 33, p. 43–44, Expt. 100B). On January 4, 1950, in another paper strip chromatographic experiment, Bunding postulated conditions for separating ACTH from its impurities and recovering it in purified form by adsorption on paper and subsequent elution therefrom (Tr. 876–879; P.Ex. 33, p. 48–50, Expt. 102B). Bunding had not as yet achieved increased purity or satisfied himself that all the necessary conditions for his process had been determined, and he conducted additional experiments in January, 1950 at adsorption pH's between 6 and 9 using filter paper as an adsorbent (Tr. 880–885).

27. On January 25, 1950, Bunding realized that he could achieve an increase in purity and he outlined a method which

formed the basis for his patent (Tr. 886–887; P. Ex. 33, p. 64, Expt. 106B).

28. In March, 1950, Bunding prepared an invention disclosure which claims January 25, 1950 as the conception date of his invention (P. Ex. 34; Tr. 888–889).

29. As of January 25, 1950, the only cellulose material used by Bunding was filter paper (P. Ex. 33); the record does not show that Bunding ever worked with Solka Floc or any other natural cellulose.

30. The invention claimed by Bunding in his patent was not conceived by Bunding until January 25, 1950.

31. Bunding's testimony with respect to his dates of invention was uncorroborated and hence there is a failure of proof of any date of invention prior to his filing date of August 15, 1950.

32. There is a serious danger of overdosage with ACTH, and the only way to test the utility of purified ACTH is clinically, in human beings (Tr. 1223–1224; 917).

33. Bunding never clinically tested cellulose purified ACTH (Tr. 894–895); and no other Armour witness was able to say whether cellulose purified ACTH was ever clinically tested by Armour (Tr. 917–919). ACTH purified by adsorption on cellulose has never been used commercially (Tr. 898–901).

34. Bunding did not reduce to practice his invention relating to the purification of ACTH with cellulose until it was constructively reduced to practice by the filing of his application for patent on August 15, 1950 because he failed to properly test the product (P. Ex. 2A).

35. Dr. E. B. Astwood of Boston purified ACTH by adsorbing it on cellulose (Solka Floc) on December 10, 1949, and eluting the ACTH therefrom with hydrochloric acid (Tr. 1178–1179; 1221–1222; D. Ex. 54). On January 14, 15, and 19, 1950, Dr. Astwood adsorbed ACTH on Solka Floc (cellulose) in $\frac{1}{10}$ normal acetic acid and eluted purified ACTH therefrom with $\frac{1}{10}$ normal hydrochloric acid (Tr. 1179–1181; D. Ex. 54).

This is the process of the Bunding patent (Tr. 799).

36. Dr. Astwood clinically tested ACTH purified by cellulose in February, 1950 (Tr. 1182–1184; 1200). This was a reduction to practice of the invention. The results of Dr. Astwood's work and clinical testing of cellulose purified ACTH were reported in a paper published in September, 1950 (D. Ex. 55; Tr. 1183–1187).

37. Dr. Astwood's testimony was fully corroborated by his associate, Dr. Raben (Tr. 1237–1256).

38. Dr. Astwood conceived the process claimed in the Bunding patent before Bunding, and Dr. Astwood reduced the process to practice before Bunding.

39. Dr. Astwood was the first inventor of the process described and claimed in the Bunding patent.

### Conclusions of Law— Bunding Patent

1. The Bunding patent is not infringed by defendant's method of purification of ACTH which employs oxycellulose. Westinghouse v. Boyden Power-Brake Co., 1898, 170 U.S. 537, 568, 18 S.Ct. 707, 42 L.Ed. 1136, 1147; Vischer Products Co. v. National Pressure Cooker Co., 7 Cir., 1949, 178 F.2d 125, 127; State Bank of Chicago v. Hillman's 7 Cir., 1910, 180 F. 732, 736; Burroughs Adding Machine Co. v. Felt & Tarrant Mfg. Co., 7 Cir., 1917, 243 F. 861, 868–869.

2. If the Bunding patent is interpreted to include other materials than natural cellulose then the Bunding patent includes inoperative substances and is invalid. Hence it is not infringed by the Astwood oxycellulose process. The Incandescent Lamp Patent (Consolidated Electric Light Co. v. McKeesport Light Co.) 1895, 159 U.S. 465, 472, 476, 16 S.Ct. 75, 40 L.Ed. 221, 223, 225; Corona Cord Tire Company v. Dovan Chemical Corporation, 1928, 276 U.S. 358, 385, 48 S.Ct. 380, 72 L.Ed. 610, 620.

3. Bunding is not entitled to the invention dates claimed by him be-

cause Bunding's testimony was uncorroborated. Israel v. Cresswell, 1948, 166 F.2d 153, 156–158, 35 C.C.P.A., Patents, 890; Jira v. Weber, Cust. & Pat.App., 1953, 201 F.2d 914, 920–922; Interchemical Corp. v. Watson, D.C.D.C.1956, 145 F.Supp. 179, 182, affirmed, 1958, 102 U.S. App.D.C. 149, 251 F.2d 390.

4. It was necessary for Bunding to show utility of his invention to reduce it to practice. Smith v. Nevin, 1934, 73 F.2d 940, 943–944, 22 C.C.P.A., Patents, 748; McKee v. Stevens, 1935, 79 F.2d 914, 915–916, 23 C.C.P.A., Patents, 701.

5. In order to establish utility of the method claimed in the Bunding patent and hence reduction to practice, the purified ACTH produced by the method required clinical testing. Isenstead v. Watson, D.C.D.C.1957, 157 F. Supp. 7, 9; Smith v. Nevin, 1934, 73 F.2d 940, 943–944, 22 C.C.P.A., Patents, 748; Ex parte Wolf, Patent Office Board of Appeals, 1945, 65 U.S.P.Q. 527, 528–9.

6. In the absence of an actual reduction to practice, the filing of a patent application constitutes a constructive reduction to practice. Automatic Weighing Mach. Co. v. Pneumatic Scale Corp., 1 Cir., 1909, 166 F. 288, 297.

7. Bunding's invention was not completed until it was constructively reduced to practice by the filing of his patent application in August, 1950; an invention is only completed by reduction to practice—mere conception is not sufficient. Petersen v. Thomas, 1925, 56 App.D.C. 113, 10 F.2d 908; Smith v. Bousquet, 1940, 111 F.2d 157, 27 C.C. P.A., Patents, 1136.

8. The Bunding patent is invalid because Astwood and not Bunding was the first inventor of the subject matter claimed in the Bunding patent. 35 U.S. C. § 102(g); Corona Cord Tire Co. v. Dovan Chemical Corp., 1928, 276 U.S. 358, 382–383, 48 S.Ct. 380, 72 L.Ed. 610, 619; Coffin v. Ogden, 1874, 18 Wall. 120, 125, 21 L.Ed. 821, 824.

9. The Bunding patent is unenforceable against defendant because plaintiff did not come with clean hands in respect of any cause of action in this case in view of the mispropriety of the prosecution of the Thompson patent in the Patent Office. Keystone Driller Co. v. General Excavator Co., 1933, 290 U.S. 240, 247, 54 S.Ct. 146, 78 L.Ed. 293, 297–298.